**GREGORY LUMBER COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

Nos. 428–80C, 532–80C, 578–80C, 626–80C, 627–80C, 628–80C, 637–80C, 134–81C to 137–81C and 146–81C.

United States Claims Court.

Dec. 29, 1986.

---

Edward F. Canfield, Washington, D.C., for plaintiff.

E. Kathleen Shahan, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

OPINION

REGINALD W. GIBSON, Judge:

## I. INTRODUCTION

This case, involving 12 docketed claims[1] filed originally in the predecessor Court of Claims intermittently over the period August, 1980 through March, 1981, once again comes before the court pursuant to defendant's 1983 unified motion for summary judgment. Defendant, by said motion, pursues the dismissal of all claims remaining following this court's earlier opinion of January 31, 1986. *See Gregory Lumber Co. v. United States,* 9 Cl.Ct. 503 (1986). That January 31, 1986 opinion entered a jurisdictional dismissal of several counts of plaintiff's amended petitions,[2] remanded a minor claim to the U.S. Department of Interior Board of Land Appeals, and concomitantly stayed a resolution of defendant's summary judgment motion as to all other counts in the remaining 11 docketed claims of plaintiff's amended petitions pending a period of limited discovery for plaintiff pursuant to, *inter alia,* RUSCC 56(f).

Following thereon, plaintiff engaged in such discovery over the period February 1, 1986 through April 15, 1986. Thereafter, both parties supplemented their initial briefs, as required, relative to defendant's pending motions for summary judgment in light of any alleged newly discovered evidence. Surprisingly, plaintiff proffered an additional 75–page memorandum supplemented by an appendix consisting of approximately 2,269 pages, which included eight unexcerpted depositions, various other documents and five affidavits.

As thoroughly analyzed by the court in its opinion of January 31, 1986, the 12 docketed claims in these cases postured an amalgamation of Tucker Act (28 U.S.C.

---

1. See Appendix A attached which is a summary schedule listing all of the docketed claims filed. Said attachment also contains other pertinent data such as docket numbers, dates claims were filed in the predecessor Court of Claims and before the Interior Board of Contract Appeals (IBCA) and the Interior Board of Land Appeals (IBLA).

2. Specifically, the January 31, 1986 opinion dismissed on jurisdictional grounds, without prejudice, plaintiff's cause of action based on violation of 43 U.S.C. § 1181a (1982), and plaintiff's road design offset claims in dockets 578–80C and 146–81C.

§ 1491 (1982)) and Contract Disputes Act (41 U.S.C. § 609(a)(1) (1982)) jurisdictional issues. At this juncture, of the remaining 12 dockets, 11 aver a separate claim by the contractor, Gregory Lumber Company, for breach of a timber sales contract with the government. The primary thrust of these claims is plaintiff's alleged failure to recover from each purchase the specified amount of timber which was estimated by the government to be recoverable in each contract.[3] Plaintiff contends, through its amended petitions, that these various recovery shortfalls, averaging 26% per contract, are the result of either bad faith dealing or misrepresentation by the government or both. Alternatively, plaintiff avers that any contractual disclaimers by defendant and any warranty against reliance by plaintiff, which insulates the government from liability, should be stricken as unconscionable.

Contrary to the other 11 contracts that are lump sum contracts, one of the docketed claims, no. 428–80C (*i.e.,* Dunn Ridge), bases the recovery it seeks on the government's alleged negligence for having failed to *mark* a number of trees for cutting which had been specifically identified to that contract at the time of sale. Lastly, three of the docketed lump sum contract claims also contain subsidiary performance price adjustment claims,[4] and one, *i.e.,* no. 134–81C, also contains a performance related counterclaim by the government. We underscore, at this posture, the fact that this opinion *only* resolves those claims asserted by plaintiff relative to the alleged timber shortfalls (*i.e.,* those claims based on bad faith, misrepresentation, breach of warranty, unconscionability, and the negligent marking of trees), and not the subsidiary performance claims.[5]

Prior to the time these claims were filed in the predecessor Court of Claims, plaintiff also sought and was denied relief by its various contracting officers. Initial decisions by the contracting officers were issued over the period November, 1978 through November, 1979. From these adverse determinations, plaintiff appealed to both the IBLA and the IBCA. The detailed history at the board level, which eventually led plaintiff to seek relief in the predecessor Court of Claims, is exhaustively documented in our earlier opinion of January 31, 1986, *supra,* which should be read as an integral background to our decision today. *See Gregory Lumber Co.,* 9 Cl.Ct. at 503.

By this opinion, we lift the current stay as to all dockets and address the merits of defendant's motion to dispose summarily of plaintiff's *timber underrun claims.* It is our considered opinion, following an exhaustive review of all briefs, supplements, and exhibits filed in this matter, and with oral argument, that defendant is entitled to summary judgment (except as otherwise noted) on all of plaintiff's timber underrun claims which are based on bad faith, misrepresentation, breach of warranty, unconscionability, and negligent marking of trees. With respect to said timber underrun claims, quite simply, plaintiff has total-

---

3. In 10 of these remaining 11 claims, the contracts were "lump sum" timber sales. However, in the eleventh, *i.e.,* no. 428–80C, the sale was for specifically marked, or specifically identified, trees, and hence, *not* lump sum.

4. In docket no. 146–81C, plaintiff asserts a breach claim based on a faulty rock source. In docket no. 134–81C, plaintiff asserts a claim based on a landslide. Lastly, in docket 532–80C, plaintiff seeks recovery based on a warranty of road costs theory.

5. We proceed in this manner, for a number of reasons, despite the fact that defendant's pending motion addresses the merits of all of plaintiff's subsidiary claims. First, the subsidiary claims are not all in the same jurisdictional posture. One (no. 134–81C) is here for Wunderlich Act review, while others (nos. 146–81C and 532–80C) are here for *de novo* review. The chance that discovery may be needed, as well as a subsequent trial on the merits relative to this latter group, has not been ruled out at this time. In addition, to complicate matters even further, the claim contained in docket 134–81C has been remanded to the Interior Board of Land Appeals (in contrast to those other "arising under" claims which were dismissed, without prejudice, in the January 31, 1986 opinion) and remains on our docket for future consideration. Finally, there is the interrelated matter of defendant's counterclaim which is not addressed by either party in any motion currently before the court.

ly failed to carry its burden, pursuant to RUSCC 56(e), to come forward with "specific facts" establishing the required elements of bad faith or misrepresentation, or at the very least facts sufficient to raise genuine issues of material fact relative thereto. *See Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Because of such failure of proof, this court is convinced that a trial on the merits on such issues would be totally inappropriate.

Notwithstanding plaintiff's contention that to apply its warranty of inspection and defendant's disclaimers of quantity would be unconscionable, we believe the undisputed facts establish, beyond cavil, that an arm's-length bargain was struck by thoroughly knowledgeable and vastly experienced parties which contained no elements of oppression, surprise, or less than knowing even-handed dealing. The disclaimers are, therefore, fully enforceable to preclude recovery under plaintiff's contention that defendant warranted the estimated quantum. Lastly, in granting defendant's motion for summary judgment relative to the plaintiff's negligent marking of trees cause of action, in docket no. 428–80C, we find that as a matter of law the inspection warranty in plaintiff's contract fully insulates the government even given the *non-lump* *sum* nature of this contract. Summary disposition in the government's favor, therefore, is appropriate.

## II. BACKGROUND

■ Each of the 12 docketed cases in issue is premised on a separate contract between the plaintiff and the U.S. Department of Interior, Bureau of Land Management (BLM), for the sale of standing timber. Eleven of said contracts are similar "lump sum" timber sales contracts, and the twelfth, no. 428–80C, is a *salvage sale* of specifically marked trees. A lump sum timber contract represents the sale of an unquantified amount of timber which is identified generally *only* by references to its geographic location (*i.e.,* the sale of such timber located within designated boundaries). *See Gregory Lumber Co.,* 9 Cl.Ct. at 506 n. 1. As mentioned earlier, there are also subsidiary performance claims found in dockets 146–81C (based on inadequate rock source for road construction), 134–81C (based on additional road usage costs due to a landslide), and 532–80C (based on the plaintiff's encountering excess road construction costs). Defendant has asserted a performance counterclaim in docket no. 134–81C.

Said 12 contracts [6] were bid on and entered into from very early in 1975 through

---

**6.** In order to fully understand the nature of the contracts at issue in this case, some general familiarity with the chronology of a BLM timber sale may be helpful. BLM's timber sales authorized pursuant to the Act of August 28, 1937 (43 U.S.C. § 1181a), as were those to the plaintiff, are governed by the procedures set out in subpart 5400 of volume 43 of the Code of Federal Regulations (CFR) (1976). All sales begin with the formation of a Timber Sale Plan (TSP), which is prepared by the BLM and takes into account suggestions from prospective timber purchasers (§ 5410.0–6 (1976)). Such plan includes an annual listing as to when various tracts of timber, included in the plan, will be offered for sale; an indication whether there will be Small Business set-asides; and finally a description of the probable location and anticipated volumes of such tracts. *Id.* Once integrated into the TSP, each sale is measured by tree cruise, log scale, weight, or such other form of measurement as may be determined to be in the public interest (§ 5420.0–6). Each of the instant plaintiff's sales was measured by "tree

cruise"—a method which determines sales volume based on the *estimated* volume of *standing* timber. This is the standard BLM method for all timber sales (§ 5422.1).

As the sale date approaches, competitive timber sales are advertised in newspapers of general circulation in the area where the sale is located (§ 5430.0–6). Usually, at least a two-week lead time for most advertisements is required. *Id.* The advertisement is commonly referred to as a "Timber Sales Notice" (TSN) and contains the location of the tract, the *estimated* total quantity of timber recoverable, the unit of measure, the total appraised value, the minimum deposit required, the time and place for receiving bids, the office where additional information may be obtained, and any other facts deemed relevant by BLM at the time (§ 5430.1).

Qualified bidders must submit with their bids a deposit of not less than 10% of the appraised value of the timber offered for sale (§ 5441.1–1). Bidding may be conducted by written bids, oral auction, or a combination of both (§ 5442.-

about April of 1977, and reflect a cumulative purchase price of approximately $8.4 million. Also, the 12 contracts were estimated by BLM to produce, in the aggregate, over 53 million net board feet of timber, once all merchantable trees were felled and converted into lumber. Despite BLM's cumulative estimated 53 million board feet (MBF) as reflected in the aggregate in Exhibit B of the 12 contracts, plaintiff alleges that it was able to actually recover only some 74% of this figure (*i.e.*, 39.5 MBF), with a resulting shortfall of approximately 13.9 million board feet. Needless to say, this apparently dramatic shortfall, ranging on individual contracts from 6.84% to 50% (with an average of 26%), is the primary basis averred for the relief sought in this litigation. (*See* Appendix B, schedule reflecting alleged variances and overpayments.)

Because of the alleged foregoing underruns (*i.e.*, the measured difference between the timber estimated by BLM and the logs scaled by plaintiff), plaintiff first sought administrative relief from its contracting officer, and then appealed the contracting officer's various denials to both the IBLA and the IBCA. Similarly, plaintiff received no comfort on the merits at the board level. As delineated in our analysis of the board proceedings contained in this court's opinion of January 31, 1986, "[w]hat actually happened before these two boards may perhaps be hospitably characterized as utter confusion." *Id.* at 508. [For a more detailed understanding of the issues which were presented and resolved at the board level, which subsequently surfaced here, the reader is referred to our January 31, 1986 opinion, *supra*. *See also* Appendix A attached hereto.]

Thereafter, 12 separate petitions were filed in the predecessor Court of Claims over the period August, 1980 through March, 1981. Jurisdiction was originally premised simultaneously, as to *each* docket, on *both* the Tucker Act and the Contract Disputes Act (CDA). This jurisdictional melange was definitively clarified in our January 31, 1986 opinion, *supra*, after a plethora of motions in both this court and our predecessor court, as follows: Dockets 428–80C, 532–80C, 626–80C, 627–80C, 628–80C, and 637–80C are all properly here pursuant to the CDA, and only the CDA. The remaining docketed claims, 578–80C, 134–81C, 135–81C, 136–81C, 137–81C, and 146–81C, do not come within the jurisdictional confines of the CDA and are therefore here pursuant to the Tucker Act, and only the Tucker Act. While we note here the unique jurisdictional basis of each docket seriatim, in a practical sense, because the *timber underrun claims* are themselves "breach" type claims rather than "arising under claims," the standard of review by this court is nevertheless *de novo* as to all such docketed claims whether premised under the Tucker Act or the CDA. *See Gregory Lumber Co.*, 9 Cl.Ct. at 520, wherein this dichotomy is analyzed.

In further clarification of the background to all of these cases, there is also one earlier ruling by the predecessor Court of Claims which deserves some comment before we proceed in more detail to the events which have occurred before *this* court. On January 12, 1982, defendant moved for summary judgment in docket 134–81C. No such similar motion was filed in any of the other 11 docketed cases. At that time, the motion encompassed a request for summary judgment only on the

1). If by oral auction, the declared high bidder must confirm his oral bid in writing by signing a "Deposit and Bid for Timber" form immediately thereafter. *Id.* In the case at bar, the evidence discloses that all plaintiff's contracts were awarded on the basis of an oral contract auction, in which a written "Deposit and Bid for Timber" form was executed immediately. *See, e.g.,* Brief Appendix, Defendant's Motion for Summary Judgment (January 18, 1983), at 61.

The contract which actually is executed by the parties is nearly identical to that which is made available to potential bidders at the time of the TSN prospectus. It is entitled "Contract for the Sale of Timber—Lump Sum Sale," and consists of 41 sections and two exhibits. Exhibit A is typically a map of the tract under contract, and Exhibit B is typically a recitation of the estimated quantity of timber recoverable. Exhibit B is based on information previously made available through the TSN. *Id.* at 65–77.

grounds that, notwithstanding the timber shortfalls, the warranty by the plaintiff against reliance on defendant's estimates and defendant's disclaimer as to quantity bars plaintiff's recovery on its breach of warranty theory. *Subsequent* to the Court of Claims' eventual ruling on that very January 1982 motion, on June 4, 1982, the amendments to plaintiff's petitions containing the bad faith, misrepresentation, and unconscionability theories were filed on January 12, 1983. In its decision on the January 1982 motion in docket 134–81C, the Court of Claims found that the defendant's numerous disclaimers against warranty of quantity, in conjunction with the plaintiff's own warranty of inspection, effectively precluded plaintiff from recovering on any underruns as a matter of law. *Gregory Lumber Co. v. United States,* 230 Ct.Cl. 1041, 1043 (1982). We are, of course, bound by that decision to the extent it *mirrors the operative facts* presented in the cases *now* before this court with regard to the timber underrun issues.

However, that is not the end of the analysis whereas here plaintiff's subsequent amendment to the petition in *all* of its other 11 docketed cases creates another dimension by raising issues, *i.e.,* bad faith, misrepresentation, and unconscionability, that were not before the court in *Gregory,* 230 Ct.Cl. 1041, *supra.* These amendments effectively revived the timber underrun issues in those 11 dockets which most probably would have been dismissed on the basis of the Court of Claims' June 4, 1982 and July 23, 1982 decisions in docket 134–81C. Consequently, this circumstance brings us to the series of remaining unified motions for summary judgment filed by the government in the 11 timber underrun dockets, now pending in this court, seeking a summary disposition of the entire litigation premised on the *amended* petitions. In

that connection, on January 18, 1983, defendant filed a motion for summary judgment in eight docketed cases (428–80C, 626–80C, 627–80C, 628–80C, 637–80C, 135–81C, 136–81C, and 137–81C) averring its entitlement to recover notwithstanding plaintiff's allegations of bad faith and misrepresentation in making its estimates. On January 24, 1983, defendant filed its motion for summary judgment in dockets 532–80C and 578–80C regarding road construction costs as well as the timber underrun issues as amended. And finally, on February 9, 1983, defendant filed a motion for summary judgment in docket 146–81C regarding road construction costs as well as the timber underrun issues as amended. For reasons previously explained, we address at this time only that portion of the foregoing motions as is related to plaintiff's timber underrun claims.

Since the filing of the foregoing defendant's 1983 motions for summary judgment, much has happened in this complex litigation [7] which bears on the decision which we issue today. For example, there are the circumstances which led to the issuance of our January 31, 1986 opinion, *supra.* That opinion issued because following the filing of the government's 1983 motions for summary judgment, the plaintiff countermoved for a stay of proceedings and for discovery pursuant to RUSCC 56(f).[8] Plaintiff sought additional discovery in order to gain access to those facts, if any, peculiarly within the knowledge of the defendant which it perceived would enable it to raise genuine issues of material fact in response to defendant's summary judgment motion(s). As found in its January 31, 1986 opinion, *supra,* this court agreed with plaintiff's position, stayed a decision on defendant's 1983 motions for summary judgment, and granted plaintiff limited dis-

---

7. Early on in a June 4, 1982 Order, the predecessor Court of Claims characterized these cases as containing a "twisted procedural posture."

8. RUSCC 56(f) (Feb. 15, 1984 edition) provides: "*When Affidavits Are Unavailable.* Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated

present by affidavit facts essential to justify his opposition, *the court* may refuse the application for judgment or *may order a continuance to permit* affidavits to be obtained or depositions to be taken or *discovery to be had or may make such other order as is just.*" (emphasis added). See *Celotex Corp. v. Catrett, supra.*

covery ending on April 15, 1986. Following discovery, said opinion ordered the parties to supplement their briefs relative to the defendant's summary judgment motion(s) in order to focus on any new evidence garnered by the plaintiff during its period of discovery.

In an attempt to forestall the RUSCC 56(f) discovery ordered in this court's January 31, 1986 opinion, defendant moved this court, on February 12, 1986, to certify for interlocutory appeal (28 U.S.C. § 1292(d)(2) (1982)) the question of the propriety of this court staying a decision on defendant's motions for summary judgment and allowing plaintiff additional discovery. On February 26, 1986, this court denied defendant's motion for § 1292(d)(2) certification. Thereafter, in a further effort to preclude discovery, the defendant petitioned the U.S. Court of Appeals for the Federal Circuit (CAFC) on March 19, 1986, for a Writ of Mandamus directing this court to deny the plaintiff RUSCC 56(f) discovery and to enter summary judgment in the government's favor on all timber underrun issues. Defendant's petition for such a writ was denied by the CAFC in an unpublished order dated March 31, 1986. Discovery then progressed uninterruptedly until April 15, 1986, after which the parties filed their respective supplements pursuant to the order contained in the court's January 31, 1986 opinion.

## III. CONTENTIONS OF THE PARTIES

Although extensively presented in numerous lengthy briefs and supplemental memoranda, the parties' arguments going to the merits of plaintiff's timber underrun claims, as amended, are quite straightforward. Plaintiff's threshold underlying theory to this entire litigation is that the written estimates of recoverable timber volume contained in Exhibit B to each of plaintiff's contracts constituted express warranties by defendant of approximate recoverable timber quantity (more or less, +/− 10%) upon which plaintiff had the unquestioned right to rely, and did so rely, in making its bid and in entering into the 12 subject con-

tracts. Defendant, on the other hand, has consistently and strenuously maintained that no such warranties were intended, none existed, and, in fact, were unequivocally *expressly* disclaimed in numerous places in each of plaintiff's contracts. In addition, defendant cites to an unconditional express warranty of inspection by which the plaintiff itself definitively warranted to defendant that *it* was entering into each contract based upon *its* inspection and *its* opinion as to the value of the timber sold thereunder. Assuming for the moment that the parties' allegations go *no further than the foregoing* (although in reality they do), the question is clearly resolved in favor of the defendant as the Court of Claims held back on July 4, 1982, relative to docket 134–81C.

However, where matters become slightly more complex is when one considers the impact on this neatly tailored scenario described *supra,* in conjunction with plaintiff's subsequently alleged theories of bad faith, misrepresentation, and unconscionability. In order to overcome the preclusive effect of the defendant's disclaimers, and plaintiff's warranty of inspection, plaintiff now argues that at the time the contracts were entered into with the government, BLM *then knew* that its volume estimates in Exhibit B to each contract were grossly overstated. To the extent the government acted with said alleged knowledge, intending injury to bidders it well knew would rely on those estimates, plaintiff proclaims such bad faith conduct demands recovery notwithstanding the existence of the broad disclaimer and its warranty of inspection. Additionally, to the extent the evidence is wanting of malice, and reflects mere knowledge or reasonable attribution of said knowledge, plaintiff asserts actionable misrepresentation to overcome the broad disclaimers and the warranty of inspection. Lastly, there is the argument by plaintiff that inasmuch as it is a small business, lacking in any meaningful bargaining power, and thoroughly dependent on the government for its livelihood, the insertion of such broad disclaimers and warranty in the contracts is indeed unconscionable un-

der the circumstances, which renders such disclaimers unenforceable in favor of the prevailing defendant's express warranty of quantity.

The thrust of defendant's response to all of the foregoing has been two-fold. First, defendant argues that even given the facts as alleged by plaintiff relative to bad faith, misrepresentation, and unconscionability, its warranty disclaimers as to estimated recoverable quantity and the warranty of inspection by plaintiff are nonetheless enforceable as a matter of law. This initial position undoubtedly accounts for defendant's unrelenting quest to resolve this litigation by summary disposition *without* a reasonable opportunity for discovery by plaintiff. Secondly, defendant argues that regardless of these abstract theories, they do not overcome the warranty disclaimers as to quantity and the warranty of inspection, inasmuch as plaintiff has presented no credible facts to support or even to raise genuine and material fact issues as to the actionable elements of bad faith, misrepresentation, or unconscionability.

While the debate as to the legal merits of defendant's first position could be endlessly waged, we have acted upon what we perceive to be the sounder approach, *i.e.*, to test plaintiff's amended petition and defendant's motions for summary judgment based on the defendant's second contention. In other words, by granting plaintiff's RUSCC 56(f) motion, and allowing it additional discovery, we have put plaintiff to the proof of *going forward* with the evidence of establishing genuine issues of material fact as required by RUSCC 56(e). Against the foregoing background, we offer a recitation of the specific discovered facts, from plaintiff's perspective, which allegedly overcome RUSCC 56(e)[9] and raise genuine issues of material fact so as to make summary judgment inappropriate. So as to not misconstrue or misstate what

plaintiff perceives to amount to facts sufficient to raise triable issues of fact, we quote directly from plaintiff's brief, *infra*. Plaintiff has asserted four main "[f]indings" *as grounds* for establishing bad faith and misrepresentation in overcoming its RUSCC 56(e) obligation. These are:

(1) BLM reports of large contracts from 1969 through 1977 at Eugene, Oregon reveal that 88.9% were underruns—knowledge concealed from the public and industry.

(2) BLM explained large underruns by inventing the theory that there were major differences between BLM and industry scaling techniques, which was untrue. BLM then applied the theory on a faulty assumption which was contradicted by data available to BLM from Gregory.

(3) For two decades BLM management was informed of serious gaps between BLM estimates and industry recovery but did nothing to solve the problem.

   (a) ineffectual programs were established, *e.g.*, the timber appraisal and cruiser/appraiser programs.

   (b) internal BLM standards and practices, *e.g.*, cruising accuracy, were concealed and unavailable.

(4) BLM took unfair advantage of industry by deliberately inserting inequitable clauses in contracts whose acceptance was made a condition of bidding and obtaining timber.

Supplemental Opposition to United States' Motions for Summary Judgment at 6. In the discussion which follows *infra*, we assess the materiality of these so-called "[f]indings" in terms of plaintiff's RUSCC 56(e) obligation.

## IV. DISCUSSION

### A. *Introduction*

We now address the questions presented relative to plaintiff's timber underrun

---

**9.** RUSCC 56(e) (Feb. 15, 1984 edition) provides, in pertinent part: "When a motion for summary judgment is made and supported as provided in this rule, *an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provid-* *ed in this rule, must set forth specific facts showing that there is a genuine issue for trial.* If he does not so respond, summary judgment, if appropriate, shall be entered against him." (emphasis added).

claims by methodically applying the operative provisions that RUSCC 56 outlines for evaluating and resolving motions for summary judgment. That process evolves around two critical determinations. First, pursuant to RUSCC 56(c)[10] relating to the motion and proceedings thereon, the moving party must show affirmatively, based on the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, that (1) there are *no* genuine issues as to any material facts; and (2) that it is entitled to judgment as a matter of law. *Balboa Insurance Co. v. United States,* 775 F.2d 1158 (Fed.Cir.1985); *SRI International v. Matsushita Electric Corp.,* 775 F.2d 1107 (Fed.Cir.1985). Second, pursuant to RUSCC 56(e),[11] it must be determined whether the *non*-moving party has merely rested upon bare allegations or denials, or has set forth any specific facts, by depositions, answers to interrogatories, or affidavits, showing that there are indeed genuine issues of material fact for trial. *Balboa,* 775 F.2d at 1163. In the case where the moving party makes the proper showing pursuant to the standards of RUSCC 56(c), the entry of summary judgment, therefore, will *not* be withheld based simply on naked allegations or unsupported conclusions of the non-moving party. *Celotex Corp.,* 106 S.Ct. at 2553. That burden "on the moving party may be discharged by 'showing'— that is, pointing out to the ... Court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 2554. In such case, the non-movant must go forward and identify specific credible facts tending to either establish all necessary elements of its cause of action, or at a minimum, sufficient to raise genuine issues of material fact relative thereto. *Id.* at 2552–53. Otherwise, *Celotex Corp.* teaches that:

the plain language of Rule 56(c) *mandates the entry of summary judgment,* after adequate time for discovery and upon motion, *against a party who fails to make a showing* sufficient to establish the existence *of an element essential to that party's case, and on which that party will bear the burden of proof at trial.* In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.

*Id.* at 2553 (emphasis added).

We begin our analysis by examining the allegations of the plaintiff and the arguments of the defendant in the context of the requirements of RUSCC 56. Plaintiff initially relies on a warranty of quantity theory relative to the board feet recoverable under each contract. Defendant has countered with an argument that such warranties, if any, were unequivocally disclaimed. Moreover, defendant further asserts that plaintiff's reliance on any warranty of quantity was equally unjustified based on plaintiff's unconditional express warranty of inspection. The threshold question we must resolve, therefore, is if defendant shows the operative facts to be uncontroverted, *i.e.,* no warranty of quantity was made, is defendant then entitled to judgment as a matter of law on the timber underrun claims. Our next step, should defendant be found to have carried its threshold burden, is to examine any newly discovered evidence proffered by the plaintiff to determine whether there exists tri-

---

**10.** RUSCC 56(c) provides: *"Motion and Proceedings Thereon.* The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

**11.** See note 9, *supra.*

able issues of fact relative to plaintiff's counter-arguments based on bad faith, misrepresentation, and unconscionability. If plaintiff succeeds in posturing issues of fact, then an assessment of the impact of the *genuineness* and *materiality* of those issues will be addressed. On the other hand, if plaintiff fails in its burden of going forward under RUSCC 56(e), then judgment shall be entered appropriately in favor of the defendant. Of course, should the defendant fail in its initial burden, our inquiry would likewise be at an end. We next discuss each of these issues seriatim.

### B. *Defendant's Entitlement*

Defendant's summary judgment motion is based almost solely on the language in the contracts themselves, and the favorable precedent in several cases in the predecessor Court of Claims. Inasmuch as the defendant's assertion of the contract disclaimers and the plaintiff's warranty of inspection are in the form of an affirmative defense to plaintiff's breach of warranty theory, regarding defendant's estimates of board feet of timber, the burden of persuasion with respect thereto rests with the defendant. In this regard, defendant's RUSCC 56(c) burden therefore entails supporting its motion with credible evidence sufficient to entitle it to a directed verdict if not controverted at trial. *Celotex*, 106 S.Ct. at 2553. In addition, defendant, as movant, also possesses the initial burden of persuading the court that, with respect to those issues for which plaintiff would possess the burden at trial (*i.e.*, bad faith, misrepresentation, and unconscionability), plaintiff's evidence is insufficient to establish at least one essential element of each of these alternative causes of action. *Id.* As discussed *infra*, we believe the record clearly shows that defendant has fulfilled each of these enumerated burdens.

The strength of defendant's proffer stems from identical language common to *each* contract, in *each* of the 11 dockets in which a timber underrun claim exists (*i.e.*, all except 134–81C which issue was previously decided by the predecessor Court of Claims). One expressed contract provision in particular contains the operative language relative to the plaintiff's warranty of inspection and the defendant's disclaimer of any warranty of quantity. That provision, "Sec. 6," provides as follows:

(a) *Purchaser warrants that this contract is accepted and executed on the basis of its examination and inspection of the timber sold under this contract and its opinion of the value thereof.*

(b) Government expressly disclaims any warranty of fitness of timber for any purpose; all timber sold hereunder is accepted *As Is* (in original) without any warranty of merchantability by Government. *Any warranty as to the quantity or quality of the timber sold hereunder is expressly disclaimed by Government.*

Defendant's Brief, January 18, 1983, Appendix at 65 (emphasis added). In addition, Exhibit B of each contract, the exhibit which contains the estimated recoverable timber figures upon which plaintiff allegedly relies, is captioned "Lump Sum Sale" and contains the additional express caveat:

Except as provided in Sec. 2, *Purchaser shall be liable for total purchase price even though quantity of timber actually cut or removed or designated for taking is less than the estimated volume or quantity shown.*

*Id.* at 77 (emphasis added). The internally referenced "Sec. 2" removes nothing from the plain meaning of this provision.

As an additional, perhaps corrobative, source of evidence as to the absence of a warranty regarding recovery of a specific quantity of timber, defendant has also proffered the bid documents which were assembled and provided to Gregory *prior* to the time the contracts were in fact signed. The BLM standard bid form entitled "Deposit and Bid for Timber: Lump Sum Sale," applicable in each sale, advises bidders in accordance with paragraph 6(a) of the Instructions to Bidders, as follows:

Bids shall specify (1) Bureau of Land Management estimated volume, (2) price per thousand board feet, and (3) total purchase price. *Estimated volume and*

*price per thousand board feet are to be used for administrative and reapprais-al purposes only.* Upon award of contract, *high bidder shall be liable for total purchase price,* including any adjustment which may be made as a result of reappraisal if an extension of time is granted, *even though quantity of timber actually cut, removed, or designated for taking is more or less than the estimated volume or quantity listed.*

*Id.* at 62 (emphasis added). Similarly, the bid confirmation form which Gregory was required to sign at the time it placed the highest oral bid at the auction is also persuasively probative on the issue. Directly above the signature line for the high bidding company's representative it states:

If timber sale contract is executed, *undersigned is liable for total purchase price even though the quantity of timber cut, removed, or designated for taking is more or less than the total esti-mated volume or quantity shown above.*

*Id.* at 61 (emphasis added).

In assessing the import of the various sources of evidence presented, *supra,* which defendant has asserted to carry its RUSCC 56(c) burden, we are at once made aware of the fact that the operative provisions of the foregoing contract(s) and bid form(s) are essentially incontrovertible. They manifest the official record of the parties' understanding and agreement as to their corresponding rights and obligations under the contract(s). Inasmuch as they contain the signatures of *both* parties, they testify forcefully to the mutual consent of the parties. From this perspective, and noting the fact that plaintiff has presented no evidence or arguments to the contrary, these contract and bid form provisions must be accepted by the court as essentially uncontroverted facts. As such, they reflect the requisite uncontroverted factual predicate for assessing defendant's entitlement to judgment as a matter of law.

■ Defendant's position on the legal merits of the warranty/disclaimer relationship is, upon considerable reflection and review, the position we are inclined to adopt. Additionally, notwithstanding the plaintiff's counter-allegations of bad faith, misrepresentation, and unconscionability, allegations for which we only look to the plaintiff for *affirmative* proof of "specific facts," defendant's reliance on the contract disclaimers and plaintiff's warranty of inspection (absent a showing by plaintiff of genuine issues of material facts here) is also fully supported by the binding precedent of the U.S. Court of Claims. *See Gregory Lumber Co.,* 230 Ct.Cl. at 1041; *Webco Lumber, Inc. v. United States,* 230 Ct.Cl. 457, 677 F.2d 860 (1982); *Caffall Brothers Forest Products, Inc. v. United States,* 230 Ct.Cl. 517, 678 F.2d 1071 (1982).

In particular, the *Webco* and *Gregory* cases were based on contracts which contained identical contractual language to that presented here. The same disclaimer of warranty of quantity, the contractor's warranty of inspection, and warnings that the purchaser is liable for the entire purchase price *regardless of the quantity of timber recovered,* were present there as are present here. Moreover, there, as here, the plaintiffs were all "invited, urged and cautioned," to inspect the timber *prior* to submitting a bid. On these facts, the Court of Claims stated conclusively in the prior *Gregory* case:

A contractor cannot, as plaintiff did, sign a contract which states, ["][p]urchaser warrants that this contract is accepted and executed on the basis of its examination and inspection of the timber sold under the contract and its opinion of the value thereof,["] in 1975, and then in 1982 come into this court, make the bare allegation that it had insufficient time to inspect the timber, and expect the court to override the contractual terms. Plaintiff cannot recover as a matter of law.

*Gregory,* 230 Ct.Cl. at 1043. As we have previously stated, unless plaintiff is able to come forward with "specific facts" supporting the allegations of bad faith, misrepresentation, and unconscionability, which we believe on the present record it cannot and has not, cases such as the prior *Grego-*

*ry* decision, and the *Webco* case cited therein, bind us to award summary judgment to the defendant on the warranty/disclaimer issues regarding the timber underruns.

In relying on the prior *Gregory* decision, and that in the *Webco* case, it must not be overlooked that neither those decisions, nor this opinion, rest upon the blanket conclusion so often asserted by the defendant in this litigation that regardless of the facts—*i.e.*, the degree or circumstances of any bad faith, misrepresentation, or unconscionability—the contract disclaimers and plaintiff's warranty of inspection nonetheless entitle defendant to judgment as a matter of law. We do not read the case law of this court and our predecessor court to support such a holding. Rather, as we explain in more detail, *infra*, the need to consider such a hypothesis, on the merits, does not arise in this litigation, and it did not arise in the prior *Gregory* decision, or the *Webco* case. But rather, because of the total absence in this case of specific material facts sufficient to even raise such issues as bad faith, misrepresentation, or unconscionability beyond the category of mere allegations, they do not form a part of the factual predicate upon which our decision turns, *infra*.

C. *Plaintiff's Burden Relative To The Existence Of Genuine Issues Of Material Fact (RUSCC 56(e)) And Defendant's Burden As To The Non-Existence And Non-Materiality Of Any Such Issues (RUSCC 56(c))*

1. *Bad Faith*

■ Plaintiff seeks to posture a genuine issue of material fact and defeat defendant's motion for summary judgment, as to each petition, by averring that the substantial underruns (excess of BLM's estimate of board feet of timber over actual recovery) in each contract are the products of defendant's bad faith. As a basic proposition, findings that public officials have acted with an intent sufficient to constitute bad faith are relatively few. This is not surprising, however, because of the long-accepted presumption that public officials act in good faith, and with integrity in the performance of their duties. *Contract Custom Drapery Service v. United States*, 6 Cl.Ct. 811, 817 (1984); *Eagle Constr. Corp. v. United States*, 4 Cl.Ct. 470, 479 (1984); *P. Francini & Co. v. United States*, 2 Cl.Ct. 7, 11 (1983); *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 617 F.2d 590, 597 (1980); *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786 (1978). As a corollary thereto, the level of proof required to overcome said presumption has been described as "well-nigh irrefragable," and will not be sustained by inferences or speculation. *Contract Custom Drapery Service*, 6 Cl.Ct. at 817; *CACI, Inc. v. United States*, 719 F.2d 1567 (Fed.Cir.1983); *American General Leasing v. United States*, 218 Ct.Cl. 367, 587 F.2d 54, 59 (Ct.Cl.1978); *Knotts v. United States*, 121 F.Supp. 630, 631 (Ct.Cl.1954). As defendant in its brief points out, "[p]laintiff must present 'irrefragable proof' such as a 'conspiracy to get rid of the plaintiff,' or that the actions of the defendant were 'motivated alone by malice,' or were 'designedly oppressive.'" Defendant's Supplemental Response at 13, *citing Knotts*, 121 F.Supp. at 130; *Gadsen v. United States*, 111 Ct.Cl. 487 (1948); *Struck Construction Co. v. United States*, 96 Ct.Cl. 186 (1942).

■ In order to sustain this heavy burden enumerated *supra*, plaintiff relies on its contention that defendant concealed from the public and industry the existence of underruns, some of large magnitude, in an average of 88.8% of those contracts (unrelated to plaintiff) let by BLM as evidence establishing "specific facts" of bad faith as to the plaintiff. There is no showing whatsoever that in any of those contracts plaintiff at bar was a party. Moreover, the underrun issue was a *perceived* industry problem as to which, the record shows, it had general knowledge for many years pre-dating the contracts in issue. Plaintiff goes on to allege that defendant's explanation for said underruns is "untrue"; and finally blandly concludes that BLM has done "nothing" to correct this problem. We find such contentions to be totally inad-

equate to raise even an inference of bad faith as against plaintiff. The allegations proffered here are fatally defective in that they simply generally relate to unnamed third parties. More importantly, they fail to posture "specific facts" clearly establishing genuine and material issues for trial, as required.

As has been held by the U.S. Supreme Court, as well as this court, bad faith, which is a form of fraud, "implies intentional conduct...." *LaMear v. United States*, 9 Cl.Ct. 562, 570, *aff'd* 809 F.2d 789 (Table) (Fed.Cir.1986), *citing Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 143, 25 L.Ed. 807 (1879). *See also Hohri v. United States*, 782 F.2d 227, 261 (D.C.Cir.1986) (Markey, C.J., dissenting). "Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry." *Wood*, 101 U.S. (11 Otto) at 143. Nowhere does the "evidence" proffered by the plaintiff suggest that the defendant attempted to secrete the evidence of past underruns regarding *unrelated* contractors. In point of fact, the source from which the government gained information as to the actual recovery and alleged underruns of timber on BLM contracts, which is the precise information which plaintiff now contends was concealed from industry, is a form filled out by contractors such as Gregory Lumber. It has never been suggested that these forms were not themselves public documents, available upon request, should plaintiff or any other contractor wish to compare them with BLM's contract estimates. Not to mention the fact that BLM contract files themselves are themselves public documents. If this was such important information, as plaintiff now contends, it is puzzling why plaintiff did not seek it prior to committing its resources to perform, not one but 12, high volume timber sale contracts. We are confident that had plaintiff sought such information, it would have been provided.

Not only is there *not one scintilla* of evidence of concealment or bad faith proffered by plaintiff (and we have thoroughly searched), to the contrary, the evidence *is*

abundantly clear that industry as a whole was painfully aware of timber underruns in BLM's lump sum sales, and had been so informed and continuously aware thereof since at least 1967, if not sooner. The most probative document evidencing this circumstance is Exhibit 24 to plaintiff's supplemental submission. That exhibit is an official report prepared by BLM which discusses the timber underrun problem in the industry as early as April, 1967. We believe that the extent of the broad exposure within industry of the underrun problem is adequately ventilated by quoting several passages from this 1967 report. The first sentence in the introduction to this report focuses directly on that which plaintiff alleges was concealed from it in 1975 and 1976 at the time the contracts in issue were executed:

> *One of the problems that members of industry discussed with Director Rasmussen at a December 1966 meeting held in Portland, Oregon, concerned the question of underruns on BLM timber sales.* The Director, at that time, promised industry that he would look into the matter.

Plaintiff's Supplement, Appendix, Exhibit 24 at 1513 (Volume IV) (emphasis added). The first subject addressed by this report is entitled: "Differences Between Cruise Volume and the Operators Reported Scale," and contains a general recognition of the precise "knowledge," in the form of a statement of industry; that plaintiff alleges herein that BLM concealed:

> The ... 16 purchasers claimed that although the cruises varied from the scale in different degrees, the scaled volume tended to underrun the cruise, *i.e.*, they did not cutout the cruised volume.

*Id.* at 1515. Without quoting endlessly therefrom, we find that the apparent substance of this report represents an obvious cooperative effort by industry and BLM to identify the sources which cause timber cutout underruns, and to propose and test methods designed to alleviate them. Plaintiff is an experienced timber operator, as is attested to by the affidavits of its officers.

We simply cannot believe that such a widespread industry concern, addressed publicly by BLM, could have escaped their attention. Even assuming arguendo that it did, it affords no credibility to plaintiff's naked allegations of bad faith and concealment. Such an allegation, in the face of the evidence presented by plaintiff, clearly borders on the frivolous.

### 2. *Misrepresentation*

Next, we address plaintiff's contention that the BLM volume estimate of board feet contained within the sales areas, because they were substantially less than timber actually recovered, constituted a misrepresentation. One of the central elements of the doctrine of misrepresentation is that the injured party's reliance upon the statement must have been innocent or reasonable. *See Summit Timber Co. v. United States*, 230 Ct.Cl. 434, 677 F.2d 852 (1982). In the context of government contracting, such a standard is measured from the perspective of what the reasonable contractor would have done when charged with knowledge common within the industry. *Virginia Engineering Co., Inc. v. United States*, 101 Ct.Cl. 516, 532 (1944); *Meyerstein, Inc. v. United States*, 133 Ct.Cl. 694, 137 F.Supp. 427, 431 (1956). In general, the test of reasonableness focuses on whether through such knowledge, or through some affirmative signal from the government, the contractor was on notice *not* to rely on the utterance in issue, or that all such statements should be investigated for the reasons given. *H.N. Bailey & Associates v. United States*, 449 F.2d 376, 386 (Ct.Cl.1971); *Rixon Electronics, Inc. v. United States*, 210 Ct.Cl. 309, 536 F.2d 1345, 1349–50 (1976). Failure to heed such warnings leaves any risk created by the alleged misrepresentation with the contractor, and renders a contractor unable to recover under a theory of misrepresentation.

We think that the indisputable evidence in the record more than amply demonstrates that, as a matter of law, the plaintiff in no way behaved reasonably in relying, as it did, on the estimates of recoverable timber contained in Appendix B to each of the contracts in issue. Several *indisputable* facts lead us to this conclusion. First, there is the long-standing industry knowledge of what were apparently consistent underruns in BLM timber contracts dating back to at least 1966. *See* Plaintiff's Appendix, Exhibit 24, as discussed *supra*. That knowledge is clearly attributable to plaintiff who did not enter into the first of these contracts until 1975. *Virginia Engineering*, 101 Ct.Cl. at 516. While plaintiff, in its averments, *supra*, makes much of the fact that defendant's explanation for these underruns is "untrue," it is the *notice value* of these underruns—that they are indeed occurring—which is critical, not why BLM allegedly took no action to correct them.

Second, there is the express disclaimer of any warranty against quantity contained in each contract. *See* Section 6. Defendant, in language too clear to be hailed as ambiguous, is in effect telling plaintiff that it takes no responsibility for what is recoverable within the boundaries of plaintiff's sales area. This warning is even more blatantly expressed where plaintiff is admonished in Exhibit B itself that it is liable for the entire purchase price regardless of the quantity of timber recovered.

Lastly, there is the admonition for plaintiff to conduct its own inspection. In no uncertain terms, plaintiff is warned, in writing, to beware of the need to determine for itself what it is bidding on. Indeed, *ab initio*, plaintiff was alerted to the principle *caveat emptor*. We believe that to claim reasonable reliance on the estimated quantity figures in Exhibit B, in light of the foregoing considerations, could in no way be characterized as reasonable. Again, the verity of defendant's explanation or its diligence in correcting these alleged underruns does not impact favorably upon plaintiff's right to rely on the estimates in Exhibit B. In light of the foregoing, therefore, plaintiff has proffered no basis for recovery on the grounds of misrepresentation. Equally important, the simple fact is that there is not one shred of evidence

proffered by plaintiff establishing "specific facts" to support a contention that genuine and material issues have been raised regarding the foregoing. Said theory of recovery, therefore, is no more than meritless allegation.

### 3. *Unconscionability*

With respect to this issue, the question is whether on these facts it would be unconscionable for this court to give credence to defendant's disclaimers against quantity and to plaintiff's warranty against reliance on BLM's estimate. In our opinion of January 31, 1986, *supra*, we noted that the doctrine of unconscionability has had little substantive development in either this court or our predecessor court. In fact, the only informative reference we find is one in the case of *Hume v. United States*, 21 Ct.Cl. 328 (1886), *aff'd*, 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393 (1889), wherein an unconscionable contract was defined as one " 'which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept on the other....' " *Hume*, 21 Ct.Cl. at 330, quoting Bouvier's Law Dictionary. Updating these notions with the Uniform Commercial Code's definition of unconscionability, as does plaintiff, is complicated in the context of government contracting, at best. In particular, the more modern concept of unconscionability, which stresses inequality of bargaining power, particularly in consumer transactions, is quite dissimilar to the realities of dealing with the federal government as one's contracting partner. It should come as no surprise to find, therefore, that there is no case in either this court or our predecessor court, where a plaintiff has prevailed by invoking the theory of unconscionability to void a perceived unfavorable contract or contract provision. Nor has plaintiff cited us to any.

■ Despite our reservations about the scope of the doctrine of unconscionability in government contracting, it is a doctrine for which binding precedent nevertheless appears to discern some role in this court. *See, e.g., Fraass Surgical Mfg. Co., Inc. v.*

*United States*, 215 Ct.Cl. 820, 571 F.2d 34 (1978); *Louisiana-Pacific Corp. v. United States*, 228 Ct.Cl. 363, 656 F.2d 650 (Ct.Cl. 1981); *Peters v. United States*, 694 F.2d 687 (Fed.Cir.1982). In the *Fraass* case, the court gave limited credence to a claim of unconscionability, but eventually denied it explaining:

> The grant of discretion to deny enforcement to an unconscionable clause in the modern Uniform Commercial Code's Section 2–302 *is not intended to permit courts to redistribute risks* allocated by differences in bargaining power, but rather to prevent oppression and unfair surprise.

(emphasis added). *Fraass*, 571 F.2d at 40. Analogous to the *Fraass* court's emphasis on surprise and oppression, is the somewhat later explanation of the court in *Louisiana-Pacific*, wherein it stated that:

> The doctrine [unconscionability] has been applied in situations where one party signed an unreasonable contract *with little knowledge of its terms, from which it could be inferred there was no consent.*

*Louisiana-Pacific*, 656 F.2d at 655 (emphasis added). In *Louisiana-Pacific*, the inherent unconscionability, however, seems to stem more from the standard concept of lack of consent. In analyzing the contention of unconscionability raised by the plaintiff in the case at bar, we therefore are guided by the foregoing case law to look for all three of these factors—oppression, unfair surprise, and lack of consent—but we are to apply them in such a way so as to not disturb any knowing allocation of risk between the parties, no matter how seemingly unfair it might appear on the surface.

■ Despite plaintiff's protestations that the implementation of the contract disclaimers and the warranty of inspection provisions, given the alleged substantial timber shortfalls, will visit inequity and unfairness on it—this court is thoroughly convinced that the record belies any such fact. First, there could have been no surprise whatsoever on the part of a reason-

able timber operator as to the substance of the bargain struck in the contracts at issue, *i.e.*, their "lump sum" nature, and the fact that the purchaser would be unconditionally liable for the *entire purchase price* regardless of the quantum of actual recovery. Several clauses and appended provisions, cited *supra*, make abundantly clear, *i.e.*, beyond cavil, the fact that the government wished to put plaintiff/contractor on notice that it, not the government, was assuming *any and all risk* as to what was precisely being sold under these contracts. The disclaimer language contained in plaintiff's contracts has been held by our predecessor Court of Claims, in both the prior *Gregory* and *Webco* cases, to be fully actionable. Equally significant, on the issue of the existence of "unfair surprise," is the fact that plaintiff's officers were admittedly highly experienced timber operators and businessmen—hardly the type to enter into multi-million dollar contracts without appreciating and evaluating the basic and fundamental risks in the "lump sum" nature of each sale.

Second, the contract disclaimers and warranty of inspection are by no means oppressive. What they required, in order to avoid the type of problems encountered by the plaintiff here, was very little, given the magnitude of each contract undertaken. These provisions not only informed but *urged* the plaintiff to go out and make its own estimate of the timber on which it was bidding; but they also urged plaintiff to ensure itself that the minimum price, and its own bid, would indeed be recoverable. All plaintiff seems to argue is that it chose *not* to perform a pre-bid cruise because it would be a wasteful and costly duplication of the cruise already performed by BLM. That this decision not to make its own pre-bid cruise later turned out to be injurious to plaintiff certainly is not the fault of the defendant. In that connection, it was a knowing and conscious decision by plaintiff, after warning by defendant, and to that extent it assumed the risk. More importantly, plaintiff presents no evidence to show that at any time *prior* to contracting it voiced any concern as to its inability to adequately protect itself through a pre-bid cruise.

While the outcome of plaintiff's decision to proceed as it did has indeed been costly, assuming of course that the amount of the alleged shortfall in each contract is accurate, there is nothing unfair or unconscionable about what took place under the terms of any of these contracts. Here knowledgeable parties, in a competitive and commercial setting, simply agreed to allocate certain risks in an all and as-is fashion. Plaintiff, not through ignorance or lack of consent, but through conscious competitive decision-making, failed to take into account all information readily available to it, and urged on it to consider, in factoring the risks into its bids. To undue such a bargain, against this background, without a further clear showing of oppression or surprise would be to do precisely what the court in *Fraass* warned against, *i.e.*, applying the doctrine of unconscionability to redistribute risks previously allocated knowingly, freely, and by the conscious mutual decision of the parties.

Much is made of the degree of bargaining power of the plaintiff relative to the BLM, the plaintiff's dependence on government timber for its livelihood, and the plaintiff's lack of meaningful choice regarding the inclusion of the disclaimer provisions in its timber sales contracts, as facts in issue portraying unconscionability. Our response to the foregoing is simply that their materiality is muted by their obvious lack of connection to the primary cause of plaintiff's plight. That is, these factors do not overcome plaintiff's warranty of inspection and plaintiff's certification that its contract bid was based on its own opinion as to the quantity, quality, and value of the timber recoverable. Such provisions were neither hidden nor are they oppressive. We conclude, therefore, that there is not one scintilla of credible evidence in the record to even raise a question as to the unconscionability of any challenged provision of these contracts beyond the level of mere allegation. Thus, we see no "specific facts" in the records raising

genuine issues for trial as required by RUSCC 56(e).

### 4. *Docket 428–80C: Negligent Marking of Trees*

As we determined *supra*, the contract underlying the claim in docket 428–80C (Dunn Ridge sale) is *not* a "lump sum" contract as are the other 11 contracts. Rather, said contract represents a salvage sale of specifically *identified* trees (*i.e.*, marked with blue paint)—and not a sale of trees identified solely by geographical location as in the other 11 contracts. Because of this distinction, a somewhat different analysis is required.

The thrust of plaintiff's argument in the Dunn Ridge sale centers on the alleged fact that it was specifically promised 72 more trees in its contract than were actually *marked* for cutting in the tract. Plaintiff claims it is entitled to recover the value of these 72 trees in spite of defendant's disclaimer of warranty as to quantity and plaintiff's warranty of inspection, because defendant has admitted in answers to interrogatories that it "inadequately marked or inadvertently failed to mark" said 72 trees. Outside of its reliance on the defendant's alleged admission of liability, plaintiff fails to address in more substance the impact of the defendant's assertion of the disclaimer of warranty of quantity and its (plaintiff's) warranty of inspection on *its* negligence theory.

■ We first address defendant's alleged admission of liability. Although plaintiff asserts that defendant admits liability for the shortfall in docket 428–80C in answers to interrogatories, the real basis for that alleged admission is contained in a letter dated August 14, 1979, from the BLM to plaintiff via its counsel. While arguably containing a tacit admission of liability,[12] we believe that that letter is nonetheless not available to plaintiff as a basis on which to premise a contention that defendant has unequivocally admitted liability. This is so because the nature of that August 14, 1979 letter, in our judgment, is such that it falls clearly within the evidentiary prohibition of Federal Rule of Evidence (FRE) 408 dealing with "Compromise and Offers to Compromise."[13] The August 14, 1979 letter is a response to a claim submitted on behalf of the plaintiff to the BLM for a contract modification and refund based on the alleged shortfall in docket 428–80C. The BLM's response outlines that it is willing to offer plaintiff a "settlement" amount in exchange for a release by plaintiff of all claims arising out of the contract in docket 428–80C. Any document prepared in such a context, and containing such language, would be clearly inadmissible at trial, and thus cannot serve as the *sole* and definitive factual predicate for plaintiff's assertion that defendant has admitted liability. As a result, we do not find in the record any support for the contention that defendant has in any way legally admitted liability for any alleged negligent marking of trees in docket 428–80C. More significantly, plaintiff does not point us to any such evidence.

■ This is not to say that in plaintiff's plethora of submitted supplemental material there is not some evidence to raise an issue of fact as to whether defendant acted negligently in failing to mark certain trees appropriated to the contract in docket 428–80C. We believe the various analyses performed by plaintiff's outside expert, contained in Appendix Exhibit 21 (affidavit of James Prochnau, and submitted reports numbered 1 and 5) clearly raise as an issue

---

**12.** The operative language in said letter is that— "the [BLM] ... is prepared to refund $45,055.04 to Gregory Lumber Company, Inc., in full *settlement* of any claims which the company feel [sic] it has in connection with the Dunn Ridge timber sale contract...." (emphasis added).

**13.** FRE 408 provides, in pertinent part, as follows:

"Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible."

of fact the proper explanation as to why there was a shortfall of specifically-identified trees in docket 428–80C. While there may remain questions of fact on the issue of negligence in this regard, however, whereas here there is no evidence of bad faith or misrepresentation, they are immaterial, as a matter of law, and are regrettably insufficient to overcome the plaintiff's burden pursuant to RUSCC 56(e) and the preclusive effect of plaintiff's unequivocal contractual warranty of inspection.

In granting the defendant summary judgment in docket 428–80C as well, we rely primarily on the plaintiff's contractual warranty of inspection, rather than on the defendant's express disclaimer of warranty. Plaintiff seeks compensation here under docket 428–80C because certain *specifically identified standing trees* were not marked and felled. It is not a claim which rests expressly on the failure to obtain an *estimated volume of recoverable board feet of cut timber.* Therefore, we believe that inasmuch as there is created herein some reasonable ambiguity as to whether the disclaimer of warranty of quantity applies to such a characteristically *non*-lump sum transaction, we decline to rest our decision on the basis of said disclaimer provision.

Where there is no ambiguity, and plaintiff has asserted none, is in the impact of plaintiff's warranty of inspection. Plaintiff warranted that it signed and accepted the contract in docket 428–80C on the basis of its own inspection and estimate of the timber on the tract. Against that background, plaintiff either failed to inspect and examine the trees as specifically warranted, or *it* did so negligently. In other words, plaintiff was the person in a position to prevent such a situation from occurring by undertaking a reasonably accurate inspection. Apparently it failed to do so for reasons it deemed to be appropriate. We fail to see how plaintiff could have *properly* conducted said inspection and still have failed to notice the allegedly missing 72 trees. If the trees were identifiable as missing *after* cutout, they were certainly similarly identifiable as missing before the cutout as well

inasmuch as they would not have been marked. This is what plaintiff itself warranted, *i.e.,* it inspected the area and observed the precise number of trees marked for cutting as stipulated in the contract, and by so doing, assumed the risk for any discrepancy which, in this case, obviously should have caused it to complain before the contract was signed, instead of after. This intervening fact of plaintiff's warranty of inspection breaks the causal link between any perceived negligence on behalf of the government in failing to mark said trees, and the resulting loss to plaintiff who entered into said contract warranting it had undertaken actions which would have discovered said preceding negligence on behalf of the government. The question as to the degree and nature of the defendant's negligence, therefore, is immaterial and cannot be asserted as a basis to overcome plaintiff's RUSCC 56(e) burden and deny defendant judgment as a matter of law.

## V. CONCLUSION

As noted *supra*, this opinion addresses only the timber underrun claims contained in plaintiff's amended petitions. Our award of summary judgment and partial summary judgment to the defendant pursuant to its 1983 unified motions for summary judgment is as follows:

(1) *Complete Summary Judgment* is awarded to the defendant per dockets 428–80C, 578–80C, 626–80C, 627–80C, 628–80C, 637–80C, 135–81C, 136–81C, and 137–81C. The Clerk shall enter judgment for the defendant therein and said petitions and amended petitions shall be dismissed. Costs to the prevailing party.

(2) *Partial Summary Judgment* is awarded to the defendant per dockets 532–80C and 146–81C. Said partial summary judgment relates to all claims in said petitions and amended petitions which state claims based on the alleged timber underruns (*i.e.,* warranty, bad faith, misrepresentation, and unconscionability).

(3) On the basis of the foregoing, remaining before the court in this litigation are warranty of rock source claims in dockets 532–80C and 146–81C, and a remanded road usage costs claim and defendant's counterclaim in docket 134–81C.[14]

Lastly, the parties shall appear before the court for a hearing at 10:00 a.m., on January 20, 1987, to determine the status and mode of resolving those claims remaining as delineated *supra.*

IT IS SO ORDERED.

**14.** While it is true that the petitions in dockets 532–80C and 146–81C alleged subsidiary claims based on a recovery of costs for an alleged road design change, said claims were dismissed, without prejudice, for lack of jurisdiction in our decision of January 31, 1986. Nothing we do here today changes that result, or prejudices plaintiff relative to the future initiation of any claim relative to those road design changes properly within our jurisdiction in the future.

APPENDIX A

Gregory Lumber Company, Inc. v. United States
Claims Court Nos. 428-80C, et al.

| BLM Contract & title group of "7", group of "4" | Contract date (signed) | Date C/O Denial | IBLA Docket No. | Appeal filed | IBLA Mtn/ stay procs filed | Mtn/ stay granted/ denied | Dismissal of appeal on Merits | IBCA Docket # | Appeal filed | IBCA Dismissal w/o prej w/in 90 days Ct decision on CDA juris. | Dismissal w/prej failure to pros. w/in 90 days of | Dismissal w/prej on basis of lack of CDA jurisdiction | Case No. | Petition | Amended Petition(s) | DMSJ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R090-TS6-64 Dunn Ridge | 5/10/76 | 8/14/79 | N/A | — | — | — | — | N/A | — | — | — | | 428-80C | 8/13/80 | 4/21/81 1/12/83 | J 12/11/80 1/18/83 |
| OR090-TS6-81 Simonsen Road | 6/8/76 | 9/28/79 | 80-60 | 10/10/79 | 4/10/80(P) | | | 1312-10-79 | 10/16/79 | 3/12/80 | 1/28/85 | — | 532-80C | 9/26/80 | 4/8/81 1/12/83 | J 9/3/81 Z 1/24/83 R |
| OR090-TS7-21 Bounds Creek | 4/14/77 | 5/14/79 | 80-418 | MD* | 4/10/80(P) | | | 1267-5-79 | 5/18/79 | 3/12/80 | 1/28/85 | — | 578-80C | 10/23/80 | 4/9/81; 4/27/82; 12/29/82; 1/12/83 | 1/24/83 |
| OR090-TS6-95 Collins Creek | 7/9/76 | 11/21/79 | 80-257 | 12/18/79 | 4/10/80(P) | | | 1326-1-80 | 12/18/79 | 3/12/80 | 1/28/85 | — | 626-80C | 11/21/80 | 4/21/81 1/12/83 | J 9/15/81 Z 1/18/83 |
| OR090-TS6-27 Russell Creek | 10/3/75 | 11/21/79 | 80-371 | 12/7/79 | 4/10/80(P) | | | 1320-12-79 | MD* | 3/12/80 | 1/28/85 | — | 627-80C | 11/21/80 | 4/8/81 1/12/83 | 1/18/83 |
| OR090-TS5-19 Gettings Crk | 9/3/75 | 11/21/79 | 80-372 | MD* | 4/10/80(P) | | | 1324-1-80 | 12/18/79 | 3/12/80 | 1/28/85 | — | 628-80C | 11/21/80 | 4/9/81 1/12/83 | 1/18/83 |
| OR090-TS5-73 Low Pass | 5/2/75 | 11/29/79 | 80-323 | 12/18/79 | 4/10/80(P) | | | 1327-1-80 | 12/18/79 | 3/12/80 | 1/28/85 | — | 637-80C | 11/26/80 | 4/9/81 1/12/83 | 1/18/83 |
| 36090-TS5-49 Fish Creek | 2/5/75 | 11/21/78 | 79-127 | 12/8/78 | 2/6/79(D) | — | 4/30/81(D) 6/2/81 (aff'd) | 1238-12-78 | 12/8/78 | | — | 9/28/79 11/23/79 3/11/80 | 134-81C | 3/9/81 | — | No motion pending. |
| OR090-TS6-18 Salmon Crk | 9/4/75 | 11/20/78 | 79-127 | 12/8/78 | 2/6/79(D) | — | 4/30/81(D) 6/2/81 (aff'd) | 1239-12-78 | 12/8/78 | | — | 9/28/79 11/23/79 3/11/80 | 135-81C | 3/9/81 | 1/12/83 | 1/18/83 |
| OR090-TS7-8 Poodle Crk | 12/17/76 | 11/21/78 | 79-127 | 12/8/78 | 2/6/79(D) | — | 4/30/81(D) 6/2/81 (aff'd) | 1237-12-78 | 12/8/78 | | — | 9/28/79 11/23/79 3/11/80 | 136-81C | 3/9/81 | 1/12/83 | 1/18/83 |
| OR090-TS6-60 Rat Creek | 3/4/76 | 11/21/78 | 79-127 | 12/10/78 | 2/6/79(D) | — | 4/30/81(D) 6/2/81 (aff'd) | 1240-12-78 | 12/8/78 | | — | 9/28/79 11/23/79 3/11/80 | 137-81C | 3/9/81 | 1/12/83 | 1/18/88 |
| OR090-TS6-75 Eagles Rest | 5/7/76 | 6/6/79 | 79-509 | 6/15/79 | 4/10/80(P) | | | 1273-6-79 | 6/13/79 | 3/12/80 | 1/28/85 | — | 146-81C | 3/11/81 | 4/8/81 12/29/82 1/12/83 | 2/9/83(RR) 3/12/82 |

* MD: Missing Document

## APPENDIX B

### Total Variances and Overpayment

| Tract | Contract Value | BLM Estimated Net Footage | Gregory Recovery | Shortage in Feet | Shortage in % | Overpayment |
|---|---|---|---|---|---|---|
| Salmon Creek | $1,270,364.10 | 8,945,400' | 6,104,870' | 2,840,530' | 31.76% | $ 418,497.51 |
| Fish Creek | 1,337,107.80 | 9,539,500' | 6,131,500' | 3,408,000' | 35.72 | 500,691.68 |
| Poodle Creek | 368,333.25 | 2,230,600' | 1,546,290' | 684,310' | 30.68 | 115,958.57 |
| Rat Creek | 499,618.05 | 3,159,700' | 2,011,330' | 1,148,370' | 36.35 | 194,546.05 |
| Dunn Ridge | 204,030.65 | 1,234,000' | 610,790' | 623,210' | 50.00 | 104,700.40 |
| Simonsen Road | 552,937.42 | 3,189,000' | 2,574,400' | 614,560' | 20.00 | 104,365.98 |
| Collins Creek | 393,263.00 | 2,674,000' | 2,436,310' | 237,690' | 8.89 | 38,030.42 |
| Bounds Creek | 870,479.08 | 4,288,000' | 3,995,070' | 292,930' | 6.84 | 71,335.69 |
| Low Pass | 768,702.50 | 4,105,700' | 3,181,250' | 924,450' | 22.55 | 184,802.10 |
| Russell Creek | 1,333,390.70 | 7,925,500' | 6,254,030' | 1,671,470' | 21.09 | 281,619.60 |
| Gettings Creek | 453,984.25* | 3,202,500' | 2,640,930' | 561,560' | 17.54 | 72,280.82 |
| Eagles Rest | 328,664.29 | 2,873,000' | 1,998,000* | 875,000* | 30.00* | 159,724.70* |
| | $8,380,875.09 | 53,366,900' | 39,484,810' | 13,882,090' | 25.95% | $2,246,553.52 |

\* Estimate

Submitted to Court by Plaintiff.