**Joseph W. MORRIS and 1120–24 Industrial Partnership, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 92–590C.**

United States Court of Federal Claims.

Sept. 23, 1997.

Elaine K. Morris, Arlington, VA, attorney of record for plaintiffs.

Domenique Kirchner, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge.

## INTRODUCTION

The trial of this government contract action was held in Washington, D.C., on March 10–18, 1997. Plaintiffs, Joseph W. Morris and 1120–24 Industrial Partnership, seek recision and restitution or, in the alternative, compensatory damages for the alleged breach of a written contract entered into with defendant to purchase a commercial property, comprised of a "garage/warehouse building" situated in the District of Columbia, from the United States Small Business Administration (SBA). The contract at issue was formed upon the SBA's acceptance of Mr. Morris' high bid for said property at a public auction of certain surplus government real estate. Pursuant to this purchase contract, the property was eventually conveyed by quitclaim deed from the SBA to 1120–24 Partnership, a Virginia General Partnership, in which Mr. Morris is a general partner.

In its Opinion of July 28, 1995, this court definitively ruled on two (2) of three (3) counts alleged in plaintiffs' Amended Complaint. The only substantive issue with respect to liability remaining for decision before this court is whether defendant breached the implied obligation of good faith and fair dealing in connection with the sale of the aforementioned building to plaintiffs. In addition, the court also has before it the issue of damages to which plaintiffs are entitled as a result of this court's holding, in its previous Opinion, that defendant breached the contract for failing to timely convey said property to plaintiffs.

This court is of the opinion that, premised on the evidence adduced at the trial on the merits, plaintiffs have failed to demonstrate by the requisite burden of proof that the defendant acted in bad faith, for the reasons hereinafter delineated. The court further finds, for the reasons given below, that plaintiffs are not entitled to any monetary damages for the Government's failure to convey the property within the contractually-mandated time period.

## FACTS [1]

The property at issue in this breach of contract action consists of a one-story and partial two-story "garage/warehouse building" located at 1120–24 Congress Street, N.E., Washington, D.C. Sometime prior to May 1990, Stern Chemical Co. pledged said property as collateral for an SBA loan. Richard DeFranco, president of Stem Chemical, was the owner of the Congress Street property. Ultimately, Stern Chemical defaulted on the loan, and the SBA foreclosed on the property. On May 9, 1990, a public foreclosure auction was held, at which the SBA, represented by its employee, Ms. Doris Rousey, bid on and purchased the Congress Street property for $100,000. Ms. Rousey was a loan specialist in the Portfolio Management Branch of the Finance and Investment Division in the SBA's Washington District Office. In connection with her employment

1. These facts are taken in large measure from the parties' stipulation as set forth in Joint Exhibit (JX) 15, consisting of paragraphs 1 through 70. The following abbreviations are also used throughout this opinion:

Tr.—Transcript of the trial on the merits;
DX—Defendant's Exhibit; and
PX—Plaintiffs' Exhibit.

duties, Ms. Rousey was responsible for the liquidation, preservation, and protection of the Congress Street property.

Soon after its purchase, the SBA attempted to sell the property with the aid of a real estate agent. From May 25 to November 25, 1990, the Congress Street property was advertised for sale as an "auto body shop" and listed at a selling price of $263,500. However, no written offers to purchase were received. Subsequently, on or about April 25, 1991, the SBA entered into an agreement with the General Services Administration (GSA), pursuant to which the GSA agreed to publicly auction off said property on the SBA's behalf. For purposes of the auction, the GSA prepared an Invitation to Bid Package, to provide relevant information to prospective bidders.

Included in the Bid Package was a brief, informative section entitled "Property Data." In addition to containing a description of the Congress Street property, this section disclosed that the property was leased by oral agreement to a tenant who paid the SBA $1,000 per month rent and used the ground floor as an automobile repair garage. This section further revealed that several artists were using the second floor as a studio and paying $500 per month to the operator of the garage. Also, the Property Data materials advised prospective bidders that the ground floor tenant "has expressed an interest in continuing to rent the space," although "[t]he agreement may be broken with 30 days written notice by either party." JX 3 at 4. The name of the aforementioned ground floor tenant, with whom the SBA had an oral agreement, was Mr. Hopeton Anderson.

In August of 1991, the GSA advertised the Congress Street property, along with another commercial property (located nearby at 2040 West Virginia Ave., N.E.), for sale by public auction. After learning of the advertised property, plaintiff Joseph Morris contacted the GSA for further information and, in turn, was referred to Ms. Rousey. She sent Mr. Morris an Invitation to Bid Package. Included with said Bid Package was an application for financing, which Mr. Morris completed and submitted to the SBA on August 15, 1991. Following Ms. Rousey's re-

view of the applications for financing, Mr. Morris received an offer of 75% financing on the property at issue from the SBA in the event that he became the high bidder at auction.

Just prior to the auction, Mr. Morris inspected the Congress Street property, observing the auto repair business on the ground floor, and briefly meeting with Mr. Anderson. At that time, Mr. Morris discovered that certain tenants were using the upstairs space as a residence in violation of D.C. zoning regulations. He telephoned Ms. Rousey shortly thereafter to inform her of such, and she agreed to correct the violation.

Despite feeling "very uneasy" about the apparent zoning violation, Mr. Morris attended the auction on August 22, 1991, feeling sufficiently secure, given Ms. Rousey's oral assurances that the zoning violation would be remedied. At the auction, Mr. Morris succeeded in becoming the high bidder for the Congress Street property, with a bid of $195,000. Ms. Rousey, that same day, sent a letter to Mr. Morris confirming the Government's acceptance of his bid and informing him that the tenant, Mr. Anderson, had been asked to have the upstairs subtenants vacate the premises. Later, on August 29, 1991, Ms. Rousey wrote to Mr. Anderson, at Mr. Morris' request, asking him to vacate the premises by September 30, 1991. Ms. Rousey also forwarded a copy of this "notice to quit" to Mr. Morris. Tr. 469; DX 26 at 1.

Pursuant to the "General Terms of Sale" contained in the Bid Package, the Government's acceptance of Mr. Morris' bid formed an agreement for the sale of the property between plaintiff and the Government. Included in this written contract were the following documents/provisions: the "Instructions to Bidders," the "General Terms of Sale," the "Special Terms of Sale," the provisions of the "Bid Form" filled out by plaintiff, and a sheet of "Corrections" (collectively "the contract"). The Property Data section, containing the information about the aforementioned tenant and subtenants, was *not* included as part of the contract.

The contract contained several provisions of note, including certain explicit disclaimers.

First, the Instructions to Bidders provided that the GSA would "answer requests for additional information concerning the property offered to facilitate preparation of bids." JX 3 at 9. Second, under the contract, "[n]o oral ... representations made by, or for, or on behalf of either party shall be a part of such contract ... without [the] consent of the Government. . . ." JX 3 at 7. Third, the General Terms of sale provided further that the information set forth in property descriptions contained in the Bid Package was "based on information available ... [and] believed to be correct, but any error or omission ... shall not constitute ground or reason for nonperformance of the contract of sale, or claim by purchaser for allowance, refund, or deduction from the purchase price." *Id.* Fourth, the property was sold " 'as is' and 'where is' without representation, warranty, or guaranty. . . ." *Id.* Lastly, settlement was to occur no later than fifteen (15) days after the Government's acceptance of the bid.

Pursuant to the terms of the contract, settlement on the Congress Street property was scheduled for September 6, 1991. In preparation for the required settlement, Mr. Morris contacted Mr. Steven Prestegard at Congressional Title and Escrow Co., Inc. to serve as his settlement agent. Upon conducting a title search, Congressional discovered several outstanding liens on the property, which had to be paid or released before Congressional could proceed with settlement. After some time and apparently some dispute, the SBA finally obtained the release of said liens, and closing of the sale of the Congress Street property took place on November 25, 1991.

At the settlement, Mr. Morris asked that the tenant's, *i.e.*, Mr. Anderson's, November rent be prorated between the buyer and the seller. Ms. Rousey responded that he had not paid rent in November and, therefore, there were no funds to prorate. After Mr. Morris insisted on being compensated, Ms. Rousey offered him a $2,000 credit on the purchase price of the property, which he accepted. The parties then settled and closed the sale, and the property was conveyed by quitclaim deed to 1120–24 Industrial Partnership, a Virginia General Partner-ship, in which Mr. Morris was a general partner. In addition, after the relevant documents had been signed, plaintiffs requested that Ms. Rousey furnish Mr. Morris with Mr. Anderson's payment record. The next day, on November 26, 1991, Ms. Rousey sent the requested payment record to the plaintiffs. This document revealed that Mr. Anderson had not paid rent for any month since July 1991, but was fully paid up through that month. Said document further reminded plaintiffs that Ms. Rousey had sent a letter to Mr. Anderson, as requested by Mr. Morris, to vacate the premises by September 30, 1991.

Upon his subsequent visit to the premises, Mr. Morris met with Mr. Anderson and entered into an oral agreement. Pursuant to said agreement, Mr. Morris leased the smaller garage at Congress Street to Mr. Anderson for $700 per month. The first payment was due on December 1, 1991. Around this time, Mr. Morris also met Mr. Tony Campbell and discovered that Mr. Anderson had been subletting two-thirds of the ground floor garage space to Mr. Campbell. Evidently, Mr. Campbell operated the automobile repair business in the larger garage, while Mr. Anderson operated the auto body business in the smaller garage at 1120–24 Congress Street. Further, Mr. Campbell, apparently fearing that he would be evicted, revealed to Mr. Morris that he had entered into an oral agreement to lease new garage space next door at 1116 Congress Street. As a consequence, Mr. Campbell left his former location at 1120–24 Congress Street at the end of November 1991.

After giving Mr. Anderson an opportunity to pay the rent, plaintiffs brought an action against him in the Landlord and Tenant Court of the District of Columbia. Mr. Anderson eventually left in late December 1991 owing rent. Since that time, plaintiffs have had some success in finding new tenants for the property.

Suit was filed in this court on August 31, 1992, seeking recision of the contract, restitution of the contract price, or, in the alternative, compensatory money damages. In their Amended Complaint, filed on March 19, 1993, plaintiffs premised their entitlement to relief

on defendant's alleged misrepresentation, mistake of fact, and failure to disclose superior knowledge with respect to the payment history of the property's primary tenant, Mr. Anderson (Count I), and defendant's alleged breach of good faith and fair dealing in failing to reveal and concealing the nonpayment of said tenant's rent until after closing (Count III). In addition, plaintiffs sought money damages for lost rental income caused by defendant's alleged failure to convey the property within the contractually-mandated time period and defendant's mismanagement of the property between the time of the auction and closing (Count II).

In its Opinion of July 28, 1995, addressing defendant's motion to dismiss and the parties' cross-motions for summary judgment, this court definitively ruled upon the substantive issues presented in Counts I and II of plaintiffs' Amended Complaint. More specifically, plaintiffs' claim premised on misrepresentation, mistake of fact, and superior knowledge (Count I) and plaintiff's allegation of mismanagement (Count II) were dismissed for failure to state a claim upon which relief may be granted. The court granted plaintiffs' cross-motion for summary judgment with respect to their claim that defendant breached the contract at issue for failing to timely convey said property (Count II). Lastly, the court denied the parties' cross-motions for summary judgment with respect to defendant's alleged breach of good faith (Count III), finding the existence of genuine issues of material fact. Thus, the only issues remaining for trial were Count II as to the issue of damages and Count III on the substantive issue.

## DISCUSSION

The court shall first address whether defendant breached its obligation of good faith and fair dealing (Count III).[2] Upon resolution of said issue, the court shall then determine the money damages, if any, to which plaintiffs are entitled as a result of this court's holding that defendant breached the contract at issue by failing to convey the property within the contractually-mandated time (Count II).

### I. *Liability—Implied Obligation of Good Faith and Fair Dealing (Count III)*

#### A. *Contentions*

The underlying theory of plaintiffs' claim is that, at the time the contract for the purchase of the property was entered into, Ms. Rousey knew that the information in the Bid Package pertaining to the tenant, Mr. Anderson, was misleading, in that it failed to convey that said tenant was unreliable and delinquent in his rent. More specifically, plaintiffs contend that Mr. Morris pointedly revealed to Ms. Rousey that his interest in the Congress Street property stemmed solely from the fact that it housed a tenant, *i.e.*, Mr. Anderson. Accordingly, aver plaintiffs, Mr. Morris sought additional information regarding Mr. Anderson. To that end, assert plaintiffs, Mr. Morris specifically asked Ms. Rousey whether Mr. Anderson was reliable in the payment of his rent. Deceptively, Ms. Rousey, allege plaintiffs, responded in the affirmative, despite her knowledge to the contrary. Plaintiffs argue that Ms. Rousey continued with this deception up until the date of settlement, at which time she indicated that the tenant was only one month behind in his rent, when she in fact knew Mr. Anderson

---

2. In their post-trial submissions, plaintiffs request that this court reconsider its previous holding dismissing plaintiffs' claim of misrepresentation, *i.e.*, Count I. In fact, we note that plaintiffs extensively argue that the Government is liable for the misrepresentation of Mr. Anderson's reliability and payment history. Pls. Post Tr. Reply Br. at 16, 19–22. To that end, plaintiffs urge the court to follow *Doherty v. United States*, 222 Ct.Cl. 511, 618 F.2d 125 (1979), an unpublished opinion which has absolutely no precedential value in this court.

We summarily reject such a request because plaintiffs have utterly failed to proffer any evidence to alter this court's finding that, assuming, *arguendo*, such representations were in fact made by Ms. Rousey, "it was not reasonable to rely, and Mr. Morris was unjustified in relying, on any statement about the tenant's payment history or reliability," in the face of: (1) the explicit and sweeping disclaimer of representation or warranty; (2) the exclusion of oral statements from the written contract; and (3) the court's previous finding that representations as to the tenant were, on these facts, only of *peripheral* importance. *Morris v. United States*, 33 Fed.Cl. 733, 746 (1995).

had not paid rent for the previous four months, *i.e.*, August to November, 1991. To the extent that defendant acted with said knowledge, intending to induce a settlement knowing full well that Mr. Morris relied on representations made with respect to Mr. Anderson's payment history and reliability, plaintiffs proclaim that such bad faith conduct demands recovery notwithstanding the existence of broad disclaimers in the contract at issue.

 Conversely, for its part, defendant has consistently and strenuously maintained that plaintiffs have failed to produce the *well-nigh irrefragable proof* necessary to overcome the presumption that Government officials act in good faith. Rather, claims defendant, Ms. Rousey acted in good faith, taking appropriate steps in furtherance of procuring a settlement and transferring ownership to plaintiffs. Ms. Rousey, argues defendant, never conveyed to plaintiffs that Mr. Anderson was reliable or paid his rent on time. In fact, asserts defendant, Ms. Rousey was not fully aware of the extent of Mr. Anderson's delinquency until after she composed the listing of his rental payments, as per Mr. Morris' request at settlement. Lastly, defendant cites to the broad disclaimers of the contract to support its contention that the parties were on notice that the information contained in the Bid Package regarding Mr. Anderson was based upon information then available to the Government and believed to be correct, and that any error or omission made by the Government did not constitute grounds for nonperformance of the

contract for sale. Accordingly, argues defendant, "pursuant to the terms of the contract for sale of the real estate, there were no obligations upon the Government to convey the property with the current tenant or with any tenant who was faithfully paying rent." [3] Thus, defendant concludes that plaintiffs have failed to demonstrate that Ms. Rousey acted in bad faith.[4]

### B. *Plaintiffs' Burden*

 The "obligation of good faith dealing is implied in every contract with the government." *Morris,* 33 Fed.Cl. at 751 (citing *Asco–Falcon II Shipping Co. v. United States,* 18 Cl.Ct. 484, 491–92 (1989)). As a general proposition, "findings that public officials have acted with an intent sufficient to constitute bad faith are relatively few." *Gregory Lumber Co. v. United States,* 11 Cl.Ct. 489, 501 (1986), *aff'd,* 831 F.2d 305 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982 (1988) (citations omitted). However, this is not surprising given "the long-accepted presumption that public officials act in good faith, and with integrity in the performance of their duties." *Id.* Moreover, mere bland inferences or unsubstantiated speculation are not enough to induce this court to abandon this rebuttable presumption. *Id.; Continental Collection & Disposal, Inc. v. United States,* 29 Fed.Cl. 644, 652 (1993). Rather, the level of proof required to overcome said presumption has been described as "well-nigh irrefragable," [5] which in turn has been equated

---

3. Defendant's Post Trial Brief, filed August 30, 1997 (Def. Post Tr. Br.), at 65.

4. Defendant also submits the affirmative defense of accord and satisfaction. Specifically, defendant alleges that the $2,000 credit to the purchase price of the contract, offered by Ms. Rousey at settlement and accepted by plaintiffs, discharges plaintiffs' present claim before the court. Def. Post Tr. Br. at 70–71.

"An accord is reach if one party agrees to supply something other than that which was originally due, and the other party agrees to accept it in settlement of an existing claim. Satisfaction is the actual performance of the accord." *Coastal Indus., Inc. v. United States,* 32 Fed.Cl. 368, 375 (1994) (citations omitted). The party asserting this defense bears the burden of proving that all the elements of an accord and satisfaction are met. *Id.*

Given the facts at bar, we find that the defendant has essentially failed to meet its burden. Specifically, the record does not contain a sufficient indication that the parties were aware of any claim arising in favor of plaintiffs at the time the $2,000 credit was offered and accepted. Thus, this court is constrained to find that there was no "meeting of the minds" regarding the import of the $2,000 credit, without which, of course, there can be no accord and satisfaction. *See id.* (citing *Westerhold v. United States,* 28 Fed.Cl. 172, 174–75 (1993)).

5. Plaintiffs contend that "well-nigh irrefragable proof of specific acts of bad faith ... has *only* been required in connection with allegations of wrongful termination, either of contract or employment relationship, wrongful cancellation by the government of a solicitation, disappointed bidder suits and the like." Plaintiffs' Post Trial

with "evidence of some specific intent to injure the plaintiff." *Gregory Lumber*, 11 Cl. Ct. at 501; *Morris*, 33 Fed.Cl. at 751; *Kalvar Corp. v. United States*, 543 F.2d 1298, 1301–02, 211 Ct.Cl. 192 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *Continental*, 29 Fed.Cl. at 652. Accordingly, a plaintiff must present *"clear and strong* proof of specific acts of bad faith," demonstrating that a Government official acted with malice or a specific intent to injure the plaintiff. *Morris*, 33 Fed.Cl. at 752 (emphasis added) (citing *Torncello v. United States*, 681 F.2d 756, 771, 231 Ct.Cl. 20 (1982); *Continental*, 29 Fed.Cl. at 652).

In its Opinion of July 28, 1995, this court found that plaintiffs could meet this difficult burden and overcome the presumption afforded Government officials if it was shown that Ms. Rousey *intentionally deceived* plaintiffs *and concealed* from them the fact that Mr. Anderson had not paid any rent since July 1991. *See Morris*, 33 Fed.Cl. at 753. However, we further noted that, if Ms. Rousey did not, in fact, *know* the extent of Mr. Anderson's delinquency, then she did not act in bad faith. *See id.* Thus, the factual issues before this court are to determine— "what did Ms. Rousey know, when did she know it, and what did she say concerning the tenant's payment of rent (or lack thereof) both before and after settlement." *Id.*

### C. *Analysis*

■ At the outset, we note that the credibility of the witnesses is crucial to this case.

This is so particularly because the key witnesses, Mr. Morris and Ms. Rousey, present conflicting testimony as to certain operative facts alleged to have transpired between themselves in connection with the sale and purchase of the Congress Street property. Furthermore, plaintiffs' case relies heavily on the testimony of Mr. Morris,[6] but very little, if any, corroborative evidence was proffered to support his allegations. Moreover, for the reasons discussed *infra*, the court is constrained to find that Mr. Morris was less than credible and, as a consequence, we totally discount his uncorroborated testimony. Thus, on this record, plaintiffs have failed to demonstrate, by the requisite burden of proof, that Ms. Rousey acted in bad faith. Accordingly, for the following reasons, we dismiss Count III of plaintiffs' complaint and any claim for relief or damages related thereto.

Cognizant of plaintiffs' heavy burden, as discussed *supra*, we initiate our analysis by examining Ms. Rousey's relationship with Mr. Anderson, the tenant of the Congress Street property, and determining from the established facts what she *knew* with respect to his payment status. Thereafter, we will examine the record to determine what representations, if any, Ms. Rousey made concerning Mr. Anderson's payment history.

### 1. *Ms. Rousey's dealings with Mr. Anderson*

Plaintiffs contend that Ms. Rousey was "aware of the status of Mr. Anderson's rent at all times." Pls. Post Tr. Br. at 24. The

---

Brief, filed April 22, 1997 (Pls. Post Tr. Br.), at 20 (emphasis added).

Simply put, plaintiffs are incorrect. *See Gregory Lumber Co.*, 11 Cl.Ct. at 501–03 (adopting "well-nigh irrefragable" proof standard to determine whether Government acted in bad faith when it allegedly knowingly over-estimated recoverable timber volumes to induce plaintiff to enter into contract).

6. The court notes that plaintiffs proffer the testimony of Mr. Edward Dudley, pursuant to Fed. R.Evid. 404(b), to prove Ms. Rousey's state of mind and fraudulent intent. Pls. Post Tr. Br. at 31. At trial, Mr. Dudley testified to certain contentious events that took place between he and Ms. Rousey. However, the record indicates that the incidents to which Mr. Dudley testified arose out of a personal, not strictly professional, relationship. In addition, his testimony pertains to

acts which occurred nearly two years after the parties closed on the Congress Street property. Accordingly, because these events are too remote and not sufficiently similar to the allegations at issue here, we agree with the defendant, and find that Mr. Dudley's testimony is neither persuasive nor probative on any issue before this court. *See United States v. Olivo*, 69 F.3d 1057, 1063–64 (1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 265, 136 L.Ed.2d 189 (1996) (discussing Fed.R.Evid. 404(b) and similarity and proximity of subsequent bad acts). On this record, we think it is more appropriate not to credit Mr. Dudley's testimony (Tr. 880–927) rather than to strike it. Accordingly, we deny defendant's oral motion to strike (Tr. 1297–1302) with respect to Mr. Dudley's testimony; we also deny defendant's oral motion to strike (*id.*) PX 45 for the same reason.

court cannot find any support for such a contention, because the record made suggests quite the opposite, *i.e.*, that Ms. Rousey was not fully cognizant of Mr. Anderson's payment history at any given time relevant to the issue at bar.

As stated *supra*, on May 9, 1990, a public foreclosure auction was held at which Ms. Rousey, acting on behalf of the SBA, successfully bid on the Congress Street property, which was previously owned by Mr. Richard DeFranco. At or about that time, she also negotiated an oral agreement to lease the property to Mr. Anderson, who had previously been leasing the same premises from Mr. DeFranco. Ms. Rousey entered into said agreement *primarily* as a means of protecting the property. More specifically, she testified that Mr. Anderson "was basically there to keep the property from being vandalized.... If we got [the rent], we were very happy. It was that kind of a deal." Tr. 344. Pursuant to the terms of their oral agreement, Mr. Anderson paid the SBA $500 for May 1990 and $1,000 per month thereafter. Moreover, because Mr. DeFranco had informed her that Mr. Anderson "was not a very good rent payer" (Tr. 240), Ms. Rousey did not accept any personal checks from him. Rather, she insisted on payment by money order or certified check. Lastly, according to their oral agreement, Mr. Anderson's rent was due monthly, but not on any specific date.

Ms. Rousey personally received and recorded all payments submitted by Mr. Anderson. Initially, she regularly checked to see if Mr. Anderson was current with his rent. However, Ms. Rousey testified that—as time passed, her "work flow became too phenomenal" because she did not have the benefit of an assistant to carry out certain clerical chores (Tr. 349, 369–70), and, as a consequence, when she received certain checks, she was not always aware as to which month said payments applied (Tr. 369).

■ Nonetheless, according to Ms. Rousey, when she had some "leisure time," she called Mr. Anderson, on two or three separate occasions, after the receipt of a partial payment to remind him that the SBA was waiting for the remainder owed for that month. Apparently, Ms. Rousey formed an opinion that Mr. Anderson was unreliable, inasmuch as she had to call him to remind him that his rent was due.[7] Notwithstanding Ms. Rousey's personal assessment of Mr. Anderson, the record readily reveals that Mr. Anderson was current, *i.e.*, not delinquent, from May 1990 to June 1991, given that there was no stipulated date for payment of the rent.

■ As the date for the public auction of the Congress Street property approached, Ms. Rousey testified that she paid even less attention to the collection of Mr. Anderson's rent, as that was neither her primary concern nor her primary job. The evidence adduced at trial leads the court to the same conclusion. Specifically, on July 23, 1991, Ms. Rousey received a $500 check, dated July 17, 1991, from Mr. Anderson. Attached with said check was a note stating: "I will mail the balance in three days. Thank you for waiting." PX 8. According to Ms. Rousey, Mr. Anderson presumably sent this note because she did not call him about the rent and he wanted to let her know that the remainder would be paid shortly. As it turns out, Mr. Anderson did not pay within the three days as promised, nor did he pay the rent in August or September. Yet, it appears that Ms. Rousey did not call or otherwise contact Mr. Anderson at anytime after the receipt of the partial payment in July to

---

7. According to Ms. Rousey's testimony, she did not pass her opinion on to either the GSA or to any prospective bidder, nor would she answer if asked about her opinion of Mr. Anderson. Apparently, she did not think it was her place to do such, because her personal opinion of Mr. Anderson was not relevant to the sale of the Congress Street property.

Ms. Rousey's determination not to disclose her personal assessment of Mr. Anderson is not indicative of bad faith. This is so because "[a]s has

been held by the U.S. Supreme Court, as well as this court, bad faith, which is a form of fraud, 'implies intentional conduct,'" and "'[c]oncealment by mere silence is not enough.'" *Gregory Lumber*, 11 Cl.Ct. at 502 (citations omitted). We further underscore that plaintiffs, pursuant to the terms of the contract, were warned that any error or omission in the property descriptions, *i.e.*, the Property Data section of the Bid Package, would not constitute grounds for non-performance.

discuss, inquire about, or request the rent owed. Finally, on October 3, 1991, Ms. Rousey received a check from Mr. Anderson for $500, apparently representing the remainder owed for the month of July. Yet again, besides merely recording its receipt, there is no indication on this record that Ms. Rousey contacted Mr. Anderson about the rent, or even made an effort to determine the status of his rent payments.[8]

In light of the foregoing, it is evident that Ms. Rousey did not diligently enforce her oral agreement to lease the Congress Street property to Mr. Anderson. Whether she failed to stay abreast of Mr. Anderson's payment history because she either did not have the time or it was simply not her primary concern is irrelevant for purposes of the issue at bar. What is pertinent, however, is

our finding that Ms. Rousey was not at all mindful of Mr. Anderson's payment history, and plaintiffs have offered no strong evidence to the contrary. Therefore, plaintiffs have failed to adduce sufficient evidence to show that Ms. Rousey was at all times fully cognizant of Mr. Anderson's payment of rent, or lack thereof.

Having determined what Ms. Rousey *knew*, we now turn our attention to the alleged representations Ms. Rousey made to Mr. Morris regarding Mr. Anderson.

### 2. *Ms. Rousey's dealings with Mr. Morris*

■ Plaintiffs argue that Ms. Rousey failed to reveal, and concealed from them, Mr. Anderson's payment history. On this record, we find that there are essentially three (3)[9] alleged conversations which took

---

8. Plaintiffs argue that Ms. Rousey was always cognizant of Mr. Anderson's payment status because she had a habit, pursuant to the Fed. R. of Evid. 406, of personally receiving and recording his rent checks and calling him whenever she received a partial payment for a given month. Accordingly, urge plaintiffs, this court should find that, when Ms. Rousey received Mr. Anderson's partial payments in July and October, she called him about the rent and was aware at all times of the extent of Mr. Anderson's delinquency. Pls. Post Tr. Br. at 24.

In light of the evidence adduced at trial, we find that plaintiffs have failed to establish any relevant habit to the issue at bar. A "habit," as contemplated by Rule 406, is a "regular response to a repeated specific situation." *Meyer v. United States*, 464 F.Supp. 317, 321 (D.Colo.1979), aff'd, 638 F.2d 155 (10th Cir.1980); *McCormick on Evidence* § 195, at 825 (4th ed.1992). While Ms. Rousey personally recorded the receipt of every payment, she maintained, as discussed *supra*, that she did not routinely check to determine whether Mr. Anderson was current, because her work load increased. Further, although Ms. Rousey testified that she called Mr. Anderson two or three times after the receipt of a partial payment to remind him that his rent was due, that alone is not sufficiently regular to rise to the level of habit evidence, for purposes of establishing that Ms. Rousey called Mr. Anderson in July and October, after the receipt of partial payments in those months. *See McCormick on Evidence* § 195, at 827 (4th ed.1992).

9. There is some conflicting testimony as to an exchange alleged to have taken place at the auction, *i.e.*, August 22, 1991. Ms. Rousey testified that Mr. Morris snuck up and whispered to her, asking whether Mr. Anderson was a good tenant. In response, she shrugged her shoulders, indicating that she was not going to answer the ques-

tion. However, plaintiffs deny that this incident ever occurred. Pls. Post Tr. Br. at 29 n. 7.

The court finds that this disputed factual issue does not bear on the question of whether Ms. Rousey breached her duty of good faith. This is so because neither Mr. Morris' nor Ms. Rousey's account of the events demonstrate bad faith, *i.e.*, deception or concealment. According to Ms. Rousey, she did not respond to Mr. Morris' inquiry, because she—(1) did not want to pass judgment on Mr. Anderson and (2) would not respond to questions that were not elicited in front of all the prospective bidders. Such conduct is not indicative of some "trick or contrivance intended to exclude suspicion and prevent inquiry" as to Mr. Anderson's payment history. *Gregory Lumber*, 11 Cl.Ct. at 502 (quoting *Wood v. Carpenter*, 101 U.S. 135, 143, 25 L.Ed. 807 (1879)). Mr. Morris was well aware that he could have asked the same question before all the prospective bidders, but he chose not to inquire. Thus, on this record, we cannot find that Ms. Rousey's conduct, *i.e.*, shrugging her shoulders, is indicative of bad faith.

Furthermore, plaintiffs assert that, assuming, *arguendo*, the event took place as Ms. Rousey testified, her response violated the terms of the contract, because she failed to provide additional information requested by a prospective bidder. Pls. Post Tr. Br. at 33. We find this contention wholly without merit.

The contract language to which plaintiffs refer states:

The General Services Administration issuing office, ... will, ... answer requests for additional information *concerning the property offered* to facilitate preparation of bids.

JX 3 at 9 (emphasis added). We first note that Ms. Rousey was an SBA, not a GSA, employee. Thus, technically Ms. Rousey was not under any contractual obligation to provide information to prospective bidders. Further, the court does not

place between Ms. Rousey and Mr. Morris that pertained to Mr. Anderson's payment of rent.

The first conversation Mr. Morris alleges to have had with Ms. Rousey occurred just prior to the auction for the Congress Street property. As discussed *supra*, sometime in August 1991, Mr. Morris learned of the public auction for certain surplus government real estate. Thereafter, he contacted the GSA for additional information and was referred to Ms. Rousey. Ms. Rousey, in turn, sent him an Invitation to Bid Package, which included an application for financing.

Mr. Morris avers that he *personally* delivered his completed application on August 15, 1991, to Ms. Rousey, at which time they had a brief meeting. He testified that at said meeting he expressed his interest in the property and the tenant, and inquired of Ms. Rousey whether Mr. Anderson "pa[id] his rent on time with some regularity" (Tr. 977)[10] or "pa[id] his rent according to [her] terms" (Tr. 974). Additionally, according to Mr. Morris, he indicated that he was looking for a tenant with "some standing of a record," and asked Ms. Rousey whether, "if [she] were in [his] shoes," Mr. Anderson was the "kind of tenant" she would want. Ms.

Rousey, asserts plaintiffs, responded in the affirmative to all these questions. Tr. 975–76.

Conversely, Ms. Rousey warmly testified that she did not meet with Mr. Morris to receive his application. She further declares that she also did not represent that Mr. Anderson paid rent promptly, that he was a reliable tenant, or paid rent as agreed.

▮ In light of the conflicting testimony and plaintiffs' utter failure to proffer *any* corroborating evidence, this court must make a factual determination as to whether or not the aforementioned conversation took place based upon Mr. Morris' credibility. In so doing, we take into consideration several factors. First, we note that Mr. Morris' memory of the event at issue is suspect, because he testified that he "can't remember exactly" what queries he posed to Ms. Rousey. Tr. 974.[11] As a result, even if we were to accept his testimony, the record made leaves the court to speculate about the precise questions posed to Ms. Rousey. Second, and more important to the court's assessment of Mr. Morris' credibility, was the revelation of specific instances of duplicitous behavior carried out by Mr. Morris.[12] Such conduct, of

---

find that Ms. Rousey's personal opinion about Mr. Anderson is relevant "information concerning the property," as contemplated by the foregoing contract provision. Such information would reasonably include *factual* data pertaining to the property itself, but certainly not individual assessments as to peripheral issues, such as the character of a tenant. Therefore, assuming, *arguendo*, Ms. Rousey shrugged her shoulders in response to Mr. Morris' inquiry regarding whether Mr. Anderson was a good tenant, we cannot find that such conduct violated the terms of the contract at issue.

10. The complete testimony is as follows:
 I said, [to Ms. Rousey,] well, what is his previous rental history? Does he pay his rent on time with *some regularity?* I didn't ask does he pay it every month on the fifth. I said with *regularity and no problems?* ... She said, no problems.
 Tr. 977 (emphasis added).

11. Only upon prodding by his counsel, *i.e.*, his wife Mrs. Morris, did Mr. Morris elaborate his testimony as to what allegedly transpired between himself and Ms. Rousey.

12. There are specifically two events to which we refer that bring into serious question Mr. Morris'

credibility. The first event pertains to the notice to quit, dated August 29, 1991, which Ms. Rousey sent to Mr. Anderson, asking him to vacate the premises by September 30, 1991. While it is uncontroverted that Ms. Rousey sent this notice *at the request of Mr. Morris,* there is some dispute as to the motivation for the issuance of said notice. However, the import of our analysis here is not to ascertain the true purpose of this notice to quit, for it does not bear upon the issue of whether Ms. Rousey acted in bad faith. Rather, the court finds that an examination of Mr. Morris' testimony regarding the aforementioned "notice to quit" is highly probative of his credibility (or lack thereof).

Mr. Morris claims that the "notice to quit" was to be used as an "artifice" to assist Mr. Anderson in getting rid of the subtenants, who were using the upstairs of the Congress Street property as a residence in violation of D.C. zoning regulations. Specifically, he testified as follows:
 I said, [to Ms. Rousey,] tell him that you've got to get rid of that illegal tenancy. And, the artifice ... would be to send him a notice to quit, but explain to him on the phone ... that *it's not really for you to leave the property, Mr. Anderson.*
Tr. 997 (emphasis added). Rather, according to Mr. Morris, Mr. Anderson was to show the notice

course, brings Mr. Morris' veracity into serious question. Finally, such behavior, coupled with the court's observations of Mr. Morris' demeanor, compels us to find that Mr. Morris was a less than credible witness. Accordingly, the court totally discounts his testimony as to the conversation he allegedly had with Ms. Rousey on August 15, 1991, and does not take it into consideration for purposes of resolving the issue at bar.[13]

Next, plaintiffs allege that a second conversation regarding Mr. Anderson occurred in late October 1991. As set forth above, the

parties initially agreed that settlement would take place on September 6, 1991. In the course of preparing for settlement, Mr. Morris contacted Mr. Prestegard of Congressional Title and Escrow Co., to act as his settlement agent. However, upon conducting a title search, Mr. Prestegard notified Mr. Morris, who in turn informed Ms. Rousey, that there were several outstanding liens on the property and an unreleased deed of trust. Settlement apparently could not take place until Ms. Rousey paid or obtained the release of these encumbrances on the property's title. While Ms. Rousey took some steps to

to quit to the subtenants and explain to them that he, *i.e.*, Mr. Anderson, was in danger of losing his business if they did not move out. Tr. 997. Thus, Mr. Morris advised Ms. Rousey that the "notice to quit" was not a true notice to vacate the premises, for it was only a tool by which Mr. Anderson could convince the subtenants to leave, rather than squarely confronting them about the ongoing code violation.

However, despite disclaiming its authenticity, Mr. Morris evidently did not hesitate to somehow legitimize the aforementioned "notice to quit" when it served his purpose. Specifically, the documentary evidence adduced at trial shows that Mr. Morris ultimately filed an action against Mr. Anderson with the Landlord Tenant Branch of the District of Columbia, on December 6, 1991. Remarkably, with his complaint, he simply attached the "notice to quit," sent by Ms. Rousey to Mr. Anderson, *i.e.*, the same notice which he testified was merely an "artifice," as proof that "notice to quit has been served, as required by law." DX 43 at 1–2; Tr. 1193–94, 1197–98, 1200. Such conduct strains credulity.

The second event to which we refer occurred shortly after the settlement, at which time Mr. Morris went to the Congress Street property and met with Mr. Anderson. At said meeting, he agreed to lease the premises to Mr. Anderson for $700 per month. In addition, Mr. Morris requested that Mr. Anderson sign a "note," dated November 26, 1991, allegedly in "lieu of a security deposit." Pls. Post Tr. Reply Br. at 13. This "note" Mr. Anderson signed, without an attorney present, was a promise to pay Mr. Morris, d/b/a J. Waverly Associates, $1,500 plus interest to "secure payment of rental arrears at 1120–24 Congress Street, ... incurred by the undersigned[, *i.e.*, Mr. Anderson]." DX 56 at 3, Tr. 1210, 1214–15, 1225–26, 1235. Yet, as of November 26, 1991, Mr. Anderson clearly did not owe Mr. Morris any past due rent, because Mr. Morris had just acquired title to said property the day before, *i.e.*, November 25, 1991. Tr. 1236. Plaintiffs attempt to argue that this "note" was truly a security deposit, but there is absolutely no language on the face of this document to indicate such. Instead, giving plain words their ordinary meaning, it is evident that Mr. Morris had Mr.

Anderson sign a note, in effect promising to pay him monies to which he was not entitled.

Mr. Morris' questionable conduct does not end here. The record further indicates that Mr. Anderson paid him $500 on said "note" sometime in December 1991. In light of the note's language, said payment was obviously for "rental arrears incurred" by Mr. Anderson. However, not only was Mr. Morris not entitled to this amount, given the facts before us, but the record indicates that he did not include said payment as rental income on his 1991 tax returns. Tr. 1224, 1236. Again, Mr. Morris attempts to explain his conduct by asserting that the "note" was in fact a security deposit. The court finds this explanation sorely lacking in substance, for the explicit language of said "note" states otherwise. Lastly, the court underscores that, on December 16, 1991, Mr. Morris brought suit against Mr. Anderson in Small Claims Court, for payment of the amount due on this "note," *i.e.*, $1,000 plus interest. DX 56 at 2. A trial was held and judgment was entered, of course, in favor of Mr. Anderson. Tr. 1220–21. We find that such behavior is indicative of chicanery and certainly less than forthcoming conduct. Thus, the foregoing events thoroughly impeach Mr. Morris' credibility before this court.

13. Even assuming, *arguendo*, that the court takes into consideration Mr. Morris' testimony regarding the conversation he allegedly had with Ms. Rousey on August 15, 1991, it does little to support plaintiffs' allegation that Ms. Rousey acted in bad faith. We begin by noting that Mr. Morris asked very generalized questions, and did *not* pointedly ask whether Mr. Anderson was delinquent. Instead, Mr. Morris testified that he wanted to know if Mr. Anderson paid with "some regularity," "according to [Ms. Rousey's] terms," and had "some standing of a record." Tr. 974, 975–76. Based on the documentary evidence adduced at trial, Mr. Anderson, at the time of the alleged conversation, *i.e.*, August 15, 1991, had failed to pay only half of the rent owed for July 1991. Consequently, even *if* Ms. Rousey responded affirmatively to Mr. Morris' inquiries, such conduct could hardly be considered deceptive on the uncontroverted facts at bar.

remedy the problems, it appears that there was some dispute as to whether the SBA was liable for the liens. Ultimately, Mr. Morris' attorney sent a letter dated October 21, 1991, to Mr. Jon Haitsuka, counsel for the SBA. The letter states that: "If ... these matters are not resolved to the satisfaction of Congressional Title Company by November 1, my client[, *i.e.*, Mr. Morris] ... has directed me to demand the prompt return of his deposit...." JX 5.

Shortly thereafter, on or about October 25, 1991, Mr. Morris claims he received a call from Ms. Rousey requesting that they continue with settlement. Mr. Morris apparently expressed to her his concern about Mr. Anderson. Specifically, he testified as follows:

I said Ms. Rousey, ... [w]hat is the story with the tenant? Is he still paying his rent, does he still want to stay? I said, does he understand that we're having problems with the settlement and that we're trying to go ahead? She said yes, he's paying and he wants to stay, but she said, don't stop the settlement.

Tr. 1025–26. Again, Mr. Morris did not offer *any*, corroborating evidence to support his hospitable testimony. In addition, we note that even the aforementioned letter to Mr. Haitsuka curiously made no mention of his interest in or apprehension about Mr. Anderson, although the tenant, according to plaintiffs, was of paramount importance to Mr. Morris.[14] Furthermore, Ms. Rousey maintains that she never represented to Mr. Morris that Mr. Anderson was paying his rent on time. As discussed *supra*, the court, having found Mr. Morris to be a less than credible witness, given his demeanor and the ventilation of conduct which calls his veracity into question, totally discounts his uncorrob-

orated and self-serving testimony. As a consequence, the court is constrained to discredit his testimony regarding said discussion for purposes of determining whether Ms. Rousey acted in bad faith.[15]

Finally, the last conversation upon which plaintiffs rely to support their contention that Ms. Rousey deceived them with respect to Mr. Anderson's payment history occurred at the settlement of the Congress Street property on November 25, 1991. The following were present at the settlement: Mr. Morris, Mrs. Morris (plaintiffs' counsel), Mr. Prestegard of Congressional Title Co. (settlement agent for Mr. Morris), Ms. Rousey, and Mr. Shalloway (SBA attorney). It seems that just as they were "getting ready to sign" the documents, either Mr. Morris or Mrs. Morris requested that the November rent be prorated between the SBA and plaintiffs. In response to their request, Ms. Rousey replied to the effect that there was no rent paid in November and, consequently, no funds to prorate.

According to Mr. Morris, when questioned why there was no rent for November, Ms. Rousey replied that Mr. Anderson had a big family and some problems. Mr. Morris further testified that he then asked Ms. Rousey when Mr. Anderson stopped paying his rent, to which she "either said [that] he stopped paying his rent in October or he stopped paying in October." Tr. 1033. While Ms. Rousey, conversely, testified that she did not say anything regarding receiving rent from Mr. Anderson in or for October, the court also has before it Mr. Prestegard's testimony, which appears to support to some extent Mr. Morris' account of what was said. However, the court cautiously notes that Mr. Prestegard acknowledged that his memory with respect to the totality of the conversa-

---

14. Specifically, plaintiffs argue that Mr. Morris was only interested in the property and, moreover, paid a premium for such, because he believed that it housed a reliable tenant.

15. Even assuming, *arguendo*, that the conversation as testified to by Mr. Morris in fact occurred, we do not find that the statements attributed to Ms. Rousey are indicative of bad faith. As the record makes clear, Ms. Rousey did receive a check dated October 3, 1991, for $500 from Mr. Anderson. Thus, in response to his question, "is

he still paying his rent," the record reveals that he was in fact paying his rent, inasmuch as Ms. Rousey received a rent check from him in October. Further, as the court has established *supra*. Ms. Rousey did not stay abreast of Mr. Anderson's payments, and did not know whether he was in arrears or that monies were owed at any given moment. Without such knowledge, the court cannot find that she intentionally deceived Mr. Morris with respect to Mr. Anderson's payment of rent.

tion is suspect.[16] Nevertheless, given that there is some corroboration of Mr. Morris' testimony, we look to see if Ms. Rousey's response indicating that Mr. Anderson stopped paying in October is deceptive, given the entire record before us.

Initially, we note that Mr. Morris' interpretation of Ms. Rousey's reply is irrelevant, because it is Ms. Rousey's *intent* which is germane for purposes of determining whether she acted in bad faith. As discussed *supra*, we find that Ms. Rousey was not at all times cognizant of Mr. Anderson's payment of rent, or lack thereof. At the time of settlement, Ms. Rousey was aware that Mr. Anderson was delinquent, and disclosed such by informing Mr. Morris that there was no November rent to prorate. It appears that she knew that no November rent had been paid because she could not recall receiving a "payment in ... hand" for that month. Tr. 382. However, as stated *supra*, the record reveals that Ms. Rousey received a payment "in hand" in October. PX 8. Thus, technically Mr. Anderson did, in fact, stop paying rent in October. If that was Ms. Rousey's best recollection at settlement, her response could hardly be considered deceitful. Furthermore, we note that she did not specifically indicate that Mr. Anderson was current as of October, presumably because she did not know. In that regard, we find that Mr. Shalloway's testimony, *i.e.*, the SBA's attorney at settlement, is particularly probative. Specifically, he testified that neither he nor Ms. Rousey were aware of the extent of Mr. Anderson's delinquency, because they did not have the relevant rental records with them at settlement. Therefore, because Ms. Rousey did not, in fact, know the extent of the delin-

quency, she did not deceive plaintiffs, or otherwise act in bad faith.

In sum, upon a careful review of the record before us, we find that plaintiffs have presented to this court mere inferences and speculation, which is not enough to prove, by a preponderance, that the Government breached its obligation of good faith, let alone overcome the well-established "well-nigh irrefragable" presumption afforded Government officials. *Kalvar Corp.*, 543 F.2d at 1301–02 We take into serious consideration our finding that Ms. Rousey did not diligently stay abreast of Mr. Anderson's payment of rent and, as a result, was not at all times aware of the extent of his delinquency. Furthermore, while plaintiffs would have this court believe that Ms. Rousey represented that Mr. Anderson was a "strong, solid, rent paying tenant," [17] we emphasize that plaintiffs have utterly failed to support such a contention. Mr. Morris, even assuming, *arguendo*, that the court takes into account his uncorroborated testimony, never pointedly asked as much. Instead, Mr. Morris testified that he was merely looking for a tenant with "some standing of a record." Lastly, the facts at bar do not demonstrate that Ms. Rousey concealed Mr. Anderson's payment history from Mr. Morris. In that connection, we take into account that Mr. Morris never made any request for the rental records until *after* settlement. When Mr. Morris made such a request, Ms. Rousey promptly responded and explicitly disclosed the extent of Mr. Anderson's delinquency. There is no reason for the court to believe that she would not have been as forthcoming had Mr. Morris made an earlier request for such documents.[18] Therefore, in light of all the foregoing, we hold that Ms. Rousey did not breach her obligation of good faith and fair dealing.[19]

---

**16.** "It's hard to remember everything that went on at closing." Tr. 672 (Prestegard).

**17.** Pls. Post Tr. Reply Br. at 7; Tr. 1014 (suggesting that Ms. Rousey represented Mr. Anderson to be a tenant with "an established good payment history").

**18.** Plaintiffs now assert that they never asked Ms. Rousey for anything in writing because they believed that Ms. Rousey was a trustee and, therefore, "had no reason to doubt her word." Pls. Post Tr. Br. at 22. Regardless, Mr. Morris was on notice that, as explicitly set forth in the writ-

ten contract at issue, "[n]o oral statements or representations made by, or for, or on behalf of either party shall be a part of such contract ... without the consent of the Government...." JX 3 at 7. Thus, plaintiffs do not have any valid justification for not seeking written assurances about Mr. Anderson's payment history.

**19.** Plaintiffs also contend that "Ms. Rousey's quotas for closing cases ... led her to mislead Mr. Morris," and, therefore, "[t]he government is liable for the consequences of giving Ms. Rousey the position of trustee ... thus invoking belief in her trustworthiness, and her conflict of interest

Having resolved the issue presented in Count III of plaintiffs' Amended Complaint, we now turn to examine the last remaining issue before this court—the issue of damages with respect to Count II.

## II. Damages—Failure to Timely Convey (Count II)

 This court, in its Opinion of July 28, 1995, granted plaintiffs' cross-motion for summary judgment as to Count II of their Amended Compliant, holding that the Government breached the contract at issue by failing to convey the Congress Street property within the contractually-mandated time period.[20] Accordingly, having established the Government's liability with respect to Count II, we now turn to address plaintiffs' claim for lost rental profits occasioned by defendant's breach.[21]

 Here, plaintiffs contend that but for the Government's failure to timely convey the Congress Street property as required,

they would have leased the premises to Mr. Tony Campbell, who at that time was one of Mr. Anderson's sub-tenants. Mr. Campbell, assert plaintiffs, was waiting through September, October, and mid-November to negotiate a lease with the new owner of the Congress Street property, i.e., Mr. Morris. However, plaintiffs contend that as time passed Mr. Campbell became fearful that he would be evicted and, as a result, by November 25, 1991, i.e., the settlement date, Mr. Campbell had already entered into an agreement to lease certain other premises at 1116 Congress Street and was in the process of moving once Mr. Morris finally met him. Lastly, Mr. Campbell, aver plaintiffs, has continuously leased space at 1116 Congress Street from December 1991 to the date of this trial, i.e., March 1997. Accordingly, conclude plaintiffs, they are entitled to $78,000 representing, inter alia, the rental income that they would have realized, and additional costs that they would not have incurred, had

which led her to deceive Mr. Morris." Pls. Post Tr. Br. at 32.

This court fails to follow plaintiffs' logic. At the outset, we note that defendant avers that Ms. Rousey was incorrectly identified as a trustee. Nevertheless, regardless of whether Ms. Rousey was or was not a trustee, plaintiffs have utterly failed to demonstrate that encouraging SBA employees to close a certain number of cases within a specified period of time necessarily gives rise to a conflict of interest. Plaintiffs would have this court infer that such goals, imposed by the SBA, motivated Ms. Rousey to deceive plaintiffs and close the deal at any and all costs. However, simply setting goals for purposes of efficiency does not, in and of itself, give rise to an intent to deceive and mislead, for it is equally reasonable to infer that SBA performance standards merely encouraged Ms. Rousey to aggressively pursue a settlement on the Congress Street property. Without more, plaintiffs have not shown that any conflict of interest exists. See Morris, 33 Fed.Cl. at 752.

20. Defendant requests, in its post-trial submission, that the court reconsider this holding in light of the evidence adduced at trial. Specifically, defendant argues that neither Mr. Morris nor the SBA were ready to settle on September 6, 1991, as required by the terms of the contract. According to the testimony of both Mr. Morris and Mr. Prestegard (the settlement agent), avers defendant, Mr. Morris himself was not prepared to settle, because Mr. Prestegard had failed to obtain the requisite title report prior to the scheduled settlement date. Therefore, concludes

defendant, both parties waived the contract provision requiring that settlement take place by September 6, 1991.

We reject defendant's request, because it is clear from the record that the various encumbrances on the title were brought to the attention of Ms. Rousey by Mr. Morris, yet she did not take any steps to remedy these problems prior to September 6, 1991. Thus, insufficient evidence was adduced at trial to alter this court's prior finding that "both parties knew and agreed that the government was unable to convey the property at the appointed time." Morris, 33 Fed.Cl. at 751 n. 16. Therefore, tender of payment, or tender of a timely title report, was not required, "as the law will not require the doing of a futile act. . . . " Id.

21. Plaintiffs now argue that defendant's failure to timely convey the property was a *material* breach. Pls. Post Tr. Br. at 37. However, as set forth by our predecessor court, the Court of Claims:

If [a party] elects instead to continue the contract, the obligations of both remain in force and the injured party may retain only a claim for damages for *partial* breach.

Cities Service Helex, Inc. v. United States, 211 Ct.Cl. 222, 543 F.2d 1306, 1313 & 1313 n. 16 (1976) (emphasis added); see Morris, 33 Fed.Cl. at 751 n. 17. In the present case, defendant fully performed and plaintiffs accepted title to the property. Thus, because plaintiffs elected to continue performance, they have waived any claim for damages for a material breach.

they leased the property to Mr. Campbell. For the reasons hereinafter, we do not agree.

■■■■ In breach-of-contract cases, the general rule at common law is to "award damages that will place the injured party in as good a position as he or she would have been in had the breaching party fully performed." *Wells Fargo Bank N.A. v. United States,* 88 F.3d 1012, 1021 (Fed.Cir.1996) (quoting *Estate of Berg v. United States,* 231 Ct.Cl. 466, 687 F.2d 377, 379 (1982)), *cert. denied,* —— U.S. ——, 117 S.Ct. 1245, 137 L.Ed.2d 328 (1997). Yet, "remote and consequential damages are not recoverable in a common-law suit for breach of contract ... especially ... in suits against the United States ... for the recovery of common-law damages, such as the instant case." *Id.* (quoting *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 524 F.2d 707, 713, 720 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976)).

■■■ Recovery for lost profits is a recognized measure of damages. *See Neely v. United States,* 152 Ct.Cl. 137, 147, 285 F.2d 438 (1961). However, "[o]ur predecessor court, the Court of Claims repeatedly refused to award damages for profits lost on transaction not directly related to contract that was breached." *See Wells Fargo,* 88 F.3d at 1022 (citing *Roberts v. United States,* 18 Cl.Ct. 351, 358 (1989)). This is so because, as a general proposition, "the fact that there would have been a profit had there been no breach is too shrouded in uncertainty for loss of anticipated profits to form a reliable measure of damages suffered." *Neely,* 152 Ct.Cl. at 147, 285 F.2d 438. It is also recognized that "not every injury resulting from a breach of contract is remedial in damages." *Wells Fargo,* 88 F.3d at 1022.

Given the record, it is clear that Mr. Morris first met Mr. Campbell shortly after settlement, at which time Mr. Campbell was in the process of moving out of the larger garage at 1120–24 Congress Street. Around that time, Mr. Morris discovered that Mr. Anderson had sub-let the larger garage to Mr. Campbell, who operated an automobile

repair shop. Apparently, pursuant to their agreement, Mr. Campbell was paying Mr. Anderson $700 per month for the use of said premises.

Moreover, it seems that, after the auction, Mr. Campbell sought to negotiate a lease agreement with the new owner, rather than to continue sub-letting from Mr. Anderson. To that end, he repeatedly questioned Mr. Anderson to determine who the new owner was, but Mr. Anderson refused to tell him.[22] Furthermore, much to Mr. Campbell's dismay, while he was patiently waiting for the new owner to visit the premises, "no one came." Tr. 93. For some reason, as time passed, Mr. Campbell began to fear that he would be evicted from the premises, and possibly lose his tools and equipment. As a consequence, having waited since late August 1991, Mr. Campbell decided on or about November 15, 1991, to move to another location. Ultimately, he entered into an oral agreement to lease a garage at 1116 Congress Street for $1,150 per month beginning in December 1991. He has continuously leased said garage at 1116 Congress Street, for $1,150 per month, from December 1991 to the date of this trial, March 1997.

In addition, the evidence adduced at trial reveals that Mr. Morris has never entered into any agreement nor pursued any negotiations with Mr. Campbell to lease the space at 1120–24 Congress Street. At most, Mr. Morris has made it known to Mr. Campbell that he is "welcome" to return to his old premises. However, despite Mr. Morris' warm offer, Mr. Campbell has rented, and continues to rent, space at 1116 Congress Street, although apparently if he "g[o]t a better deal" he would move. Tr. 96.

On these largely uncontroverted facts, plaintiffs would have the court find that they are entitled to lost profits of $78,000 for a delay of approximately two and one-half months, principally based upon Mr. Campbell's testimony that he wanted to stay. That is not enough. We find that plaintiffs' claim for lost rental income is wholly conjectural and highly speculative. The lost profits sought relate not to the particular contract at

---

22. Mr. Campbell's signed statement reads: "I was forced to leave the premises ... because Mr. Anderson refused to notify me of the name and address of the new landlord." DX 66.

issue here, but to a prospective collateral contract that plaintiffs had not yet entered into and allege they would have, but for the Government's breach. The following analysis set forth by our predecessor court, and recently embraced by the Federal Circuit, readily resolves the issue at bar:

> [T]here is a distinction by which all questions of this sort can be easily tested. If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment. then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. These are part and parcel of the contract itself, and must have been in the contemplation of the parties when the agreement was entered into. But if they are such as would have been realized by the party from *other independent and collateral undertakings,* although entered into in consequence and on the faith of the principal contract, then they are too uncertain and too remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

*Ramsey v. United States,* 121 Ct.Cl. 426, 435, 101 F.Supp. 353, 357–58 (1951) (emphasis added), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952); *Wells Fargo,* 88 F.3d at 1023. The foregoing "test," when applied to the facts in the instant case, is fatal thereto and, therefore, disposes of plaintiffs' claim.

Unquestionably, the contract entered into between plaintiffs and the Government was solely for the sale of a garage/warehouse building, "as is" and "where is." The Government was clearly not selling any leases related thereto, and Mr. Morris admits as much. Moreover, the alleged lost rental income, which plaintiffs now seek, is income that would have been realized *only* upon entering into an "independent and collateral" agreement with Mr. Campbell. Moreover, it is probative that Mr. Morris did not even consider entering into a lease agreement with Mr. Campbell until sometime *after* settlement, for that is the first time he encountered Mr. Campbell. It is clear beyond cavil, therefore, that the loss of Mr. Campbell's rental income was not within the contemplation of the parties at the time the contract was formed and would not have been damages reasonably foreseeable by the defendant. *See Rocky Mountain Constr. Co. v. United States,* 218 Ct.Cl. 665, 666, 1978 WL 8468 (1978).[23] Lastly, we also take into consideration that, on this record, there is no compelling evidence to indicate that, even if the Government had promptly conveyed the property to plaintiffs, Mr. Campbell would have entered into a lease agreement with Mr. Morris at that time, let alone remain a tenant for six years. In that regard, we take into account Mr. Campbell's testimony that, while he feels "welcome" to lease his former premises, he has not, to this day, chosen to do so. Tr. 135. Thus, although said agreement was premised on the "faith of the principal contract," *i.e.,* the sale of the Congress Street property, they are too remote and uncertain and, accordingly, are not compensable.

## CONCLUSION

In view of the foregoing, plaintiffs' claim with respect to Count III of the Amended Compliant is hereby dismissed, as are any and all claims for relief or damages related thereto. Further, we find that plaintiffs are not entitled to any compensatory damages

---

**23.** Plaintiffs rely on the case of *Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438 (1961). In that case, defendant breached a mineral lease by refusing to allow plaintiff to strip-mine the land. The lease was eventually assigned to another, who was allowed to mine the property, thereby providing the court with a reasonable basis for estimating plaintiff's loss. The court there found that lost profits were recoverable.

Unlike the case at bar, "the profits lost on the mine were caused directly by the breach and were proven with certainty." *Wells Fargo,* 88 F.3d at 1023 (interpreting *Neely v. United States,* 152 Ct.Cl. at 146–47, 285 F.2d 438). Moreover, it is patently clear that the only reasonable and foreseeable purpose of the contract at issue there was to allow the plaintiff to mine the land for profit. *See id.* Conversely, the present case involves a claim for profits plaintiffs could have realized only if they had entered into an agreement with a *third party.* Such damages are certainly not the *direct* result of the Government's failure to timely convey the property, inasmuch as the profits were neither contemplated by the parties nor foreseeable by the defendant.

for defendant's failure to timely convey title to the property at issue, *i.e.,* Count II. The Clerk shall enter judgment consistent with the above and also with this court's Opinion of July 28, 1995. No costs.[24]

IT IS SO ORDERED.

---

**24.** While in an Order dated March 19, 1997, the court indicated that closing arguments would be heard at a later date, the court observes that closing arguments are solely for the benefit of the court. Inasmuch as the court is satisfied that closing arguments will serve no significant purpose in aiding the court, we find that closing arguments are not necessary.